IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| MACK DAVIS, R. KENNETH BABB, CHRIS STEWART, CHARLES L. RYAN, JOANNE F. HESSEY, CARL P. HOLVECK, FRANCIS MASE, TABE MASE, KRISTIN YOUNG POWELL, JAMES MONROE POWELL, IV, ELMER VELSACO, CAROLYN VELASCO, KIMBERLY BERRY, SANFORD MILLER, and RANDY BARFIELD, each Individually, and on behalf of, Plaintiff Class Members, | § § § § § § § § § § § § § | |
| *Plaintiffs*, | § § | CASE NO. _____ |
| vs. | § § | Jury Trial Demanded |
| WELLS FARGO BANK, N.A., WACHOVIA BANK, N.A., GREENLINK, LLC, WELLS FARGO HOME MORTGAGE, INC., and AMERICA'S SERVICING COMPANY, and DOES 1 through 10 inclusive, | § § § § § § § | |
| *Defendants*. | § § | |

**PLAINTIFFS' ORIGINAL COMPLAINT**

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

## I.  INTRODUCTION AND SUMMARY OF CASE

1.      This is a proposed class action, filed under Federal Rule of Civil Procedure 23, to redress the rights and losses of purchasers of lots in the resort land development known as The Sanctuary at Costa Grande (hereinafter referred to as "The Sanctuary") in Port O'Connor, Calhoun County, Texas.  The losses were, and are, caused by a pattern of unlawful conduct by Wells Fargo Bank, N.A. (hereinafter referred to as "Wells Fargo"), Wachovia Bank, N.A. (hereinafter referred to as "Wachovia"), Wells Fargo Home

Mortgage, Inc. (hereinafter referred to as "Wells Fargo Home Mortgage"), Greenlink, LLC (hereinafter referred to as "Greenlink"), and America's Servicing Company (hereinafter referred to as "America's Servicing Company") (collectively "Defendants"). The Plaintiffs seek damages under federal and state law claims for loss of credit, loss of significant amounts of money, the loss of future business dealings, severe emotional stress and mental anguish, reasonable and equitable attorneys' fees, exemplary damages, prejudgment and post judgment interest, and court costs, including but not limited to expert witness fees and fees for depositions, among other elements of damages.

## II.  PARTIES

**Plaintiffs**

2.      Plaintiff Sanford Miller is a resident of Florida.  Mr. Miller is the President and CEO of U-Save Car Rental.  Plaintiff Randy Barfield is a resident of North Carolina.  Mr. Miller and Mr. Barfield purchased Lots 119, 348, and 258 in The Sanctuary Phase 1 (collectively, the "Lots") on or about February 19, 2007.  They purchased Lot 119 for $189,880.00 and Lots 348 and 258 for $325,880.00 and $279,880.00, respectively.  Mr. Miller and Mr. Barfield financed the Lots through Wachovia.   The promissory notes are currently in default, and, as a result of the Wells Fargo's market value manipulation tax savings scheme described herein, they are currently under a threat of foreclosure by Wells Fargo.   Importantly, prior to initiating a foreclosure proceeding, Wells Fargo reported on Mr. Miller's credit rating that the Lots were in foreclosure and improperly reported the loans as "home equity loans."

3.      As a result, Mr. Miller's credit rating, which was a 766, has been diminished to a dangerously low 566 rating.  Prior to the loans going into default and prior to receiving

the Notice of Acceleration, Mr. Miller contacted Wells Fargo on numerous occasions regarding his refinancing options. On several occasions, he was told by a Wells Fargo representative that his only options were to put down 60% of the value of the loan and pay interest at 9% thereafter. Wells Fargo's representative further stated that Wells Fargo did not care whether or not Mr. Miller defaulted, or was foreclosed on, because Wells Fargo was guaranteed to get paid on Mr. Miller's Loans through the federal loan loss guarantee, as described in detail herein.

4.      Thereafter, Wells Fargo's representative, Tammy Yorba, a consumer advocate for Wells Fargo, represented to Mr. Miller that she and Wells Fargo were well aware of the various valuation issues related to The Sanctuary. She vowed to put Mr. Miller and Mr. Mr. Barfields' loans on hold until the issues could be resolved and a reasonable refinance plan could be presented to Mr. Miller and Mr. Barfield. The issues never got resolved and Mr. Miller was never presented with a reasonable refinance plan. Instead, Wells Fargo's counsel got involved and informed Mr. Miller that Wells Fargo no longer wished to communicate with him directly and was not interested in offering any refinancing plans, short of Mr. Miller and Mr. Barfield putting down close to 60% of the value of the loans.

5.      As a result of Wells Fargo's various actions and omissions, Mr. Miller has been unable to continue to borrow money personally or for his business. Further, because Wells Fargo has substantially devalued the Lots, he cannot find a bank that is willing to refinance the Lots at a reasonable rate. Thus, Mr. Miller has suffered damages.

6.      Plaintiffs David and Corinthe Freeman are residents of San Bernardino County, California. They purchased Lot 249 in The Sanctuary Phase 1 on January 22, 2007 for

the price of $225,880.00 and financed the purchase with a loan through Wachovia. Wells Fargo sold the lot at a non-judicial foreclosure sale in December of 2010 for $76,150.00.  As a result of the actions of Wells Fargo, including the wrongful foreclosure, Plaintiffs remain liable for a deficiency in the amount of no less than $149,730.00.  They lost all monies invested in the property to date, a sum of approximately $50,000.00.  Although they once had a credit score in excess of 800, the foreclosure has damaged their credit to the point where they can no longer obtain "Parent Plus" loans for their daughter's college education and have had difficulty obtaining a lease for Mr. Freeman's required company car.  Further, they have suffered emotional distress as a result of the actions of Wells Fargo.

7.     Plaintiff Kimberly Berry is a resident of Lincoln County, North Carolina.  She purchased Lot 226 in The Sanctuary Phase 1 on January 23, 2007, for the price of $189,880.00 and financed the purchase with a loan through Wachovia.  The lot was sold at a non-judicial foreclosure sale in September of 2009.

8.     Plaintiff Mack Davis is a resident of Harris County, Texas.  He purchased Lots 124 and 125 in The Sanctuary Phase 1 on November 28, 2007, for the price of $179,880.00 each and financed the purchase with loans through Wachovia.  Both promissory notes are currently in default, and, as a result of the Wells Fargo's market value manipulation tax savings scheme described herein, he is currently under a threat of foreclosure by Wells Fargo.  As a result of the actions of Wells Fargo, Mr. Davis has suffered the loss of his investment, substantial loss to both his personal and business credit rating, damage to his personal and business reputations, and he has suffered health problems arising from emotional distress and mental anguish.  Additionally, he has

4

incurred in excess of $6,000.00 in attorney's fees in vain attempts at securing a loan modification agreement with Wells Fargo.

9.      Plaintiffs Elmer and Carolyn Velasco are residents of Harris County, Texas.  They purchased Lot 17 in The Sanctuary Phase 1 on March 17, 2007, for the price of $79,880.00, and Lot 136 in the Sanctuary Phase 1 on April 13, 2007, for the price of $179,892.00.  The purchases of both lots were financed through Wachovia.  Wells Fargo sold Lot 136 at a non-judicial foreclosure sale in May of 2010 for $37,408.83.  As a result of the actions of Wells Fargo, including the wrongful foreclosure of Lot 136, Mr. and Mrs. Velasco have suffered the loss of their investment, damage to their credit rating, experienced severe emotional distress, and remain liable for a deficiency in the amount of no less than $142,483.17.

10.     Plaintiff R. Kenneth Babb is a resident of Davie County, North Carolina.  He purchased Lot 363 in The Sanctuary Phase 1 on May 11, 2007, for the price of $249,880.00 and financed the purchase with a loan through Wachovia.  Mr. Babb made payments through May of 2011.  Payments on the promissory note are past due and foreclosure has been threatened.  As a result of the actions of Wells Fargo, including their unwillingness to offer reasonable refinancing options and their looming foreclosure on Lot 363, Mr. Babb has and/or will suffer damages for the loss of his investment, a potential deficiency in a foreclosure action, damage to his credit rating, and damages to his personal and business reputations.

11.     Plaintiff Chris Stewart is a resident of Alameda County, California.  He purchased Lot 311 in The Sanctuary on December 21, 2006, for the price of $84,880.00.  Mr. Stewart purchased Lot 165 in The Sanctuary on August 27, 2007, for the price of

$202,900.00.  Mr. Stewart owns both lots, whose present market values have been artificially and illegally reduced because of Wells Fargo's market-manipulation/tax-savings scheme described herein.  Due to Wells Fargo's less than arms-length "fire sale" comparables and fraudulent appraisals, Lots 311 and 165 are currently "valued" at $24,760.00 and $64,910.00, respectively.  But for Wells Fargo's scheme, Mr. Stewart's property value would be significantly higher, based upon actual market comparables.

12.    Plaintiffs Charles L. Ryan and Joanne F. Hessey are residents of Davidson County, North Carolina.  They purchased Lot 120 in The Sanctuary Phase 1 in January of 2007, for the price of $189,880.00 and financed the purchase with a loan through Wachovia.  Mr. Ryan and Ms. Hessey then purchased Lot 109 in The Sanctuary Phase 1 on April 9, 2007, for the price of $189,880.00 and again financed the purchase with a loan through Wachovia. When Wells Fargo failed to offer any meaningful refinancing options, Mr. Ryan and Ms. Hessey obtained a home equity loan on a second home through another bank and were able to pay off the balances on the promissory notes.  Mr. Ryan and Ms. Hessey currently own the two lots.  However, as a result of the actions of Wells Fargo, Mr. Ryan and Ms. Hessey have suffered damage to their credit ratings and loss of the value of their property. Appraisals conducted on behalf of Wells Fargo have fraudulently reduced the value of Lots 120 and 109 to $30,000.00 and $30,109.00, respectively.

13.    Plaintiff Carl P. Holveck is a resident of Tarrant County, Texas.  He purchased Lot 120 in The Sanctuary Phase 2 on September 24, 2007, for the price of $259,000.00.  The current market value of Mr. Holveck's lot has been artificially and illegally reduced because of Wells Fargo's market value manipulation tax savings scheme described herein.  Due to Wells Fargo's less than arms-length "fire sale" comparables and

fraudulent appraisals, Mr. Holveck's lot is currently "valued" at $35,000.00. But for Wells Fargo's scheme, Mr. Holveck's property value would be significantly higher, based upon actual market comparables.

14.     Plaintiff James Monroe Powell, IV, is a resident of Mecklenburg County, North Carolina. He purchased Lot 162 in The Sanctuary Phase 1 on December 21, 2006, for the price of $174,880.00 and financed the purchase with a loan from Bank of America.  Mr. Powell made payments through March 1, 2011.  Payments on the promissory note are now past due and foreclosure has been threatened.

15.     Plaintiff Kristin Young Powell is a resident of Mecklenburg County, North Carolina. She purchased Lot 222 in The Sanctuary Phase 1 on December 21, 2006, for the price of $189,880.00 and financed the purchase with a loan from Bank of America.  Ms. Powell made payments through March 1, 2011.  Payments on the promissory note are now past due and foreclosure has been threatened.

16.     Plaintiffs Dr. Francis and Tabe Mase are residents of New Castle County, Delaware. They purchased Lots 52, 417 and 426 in The Sanctuary Phase 1 on March 13, 2007, for the prices of $79,880.00, $129,880.00 and $129,880.00 respectively.   They financed the purchases with loans through First National Bank of Port Lavaca.  Those loans are currently in default.   Due to Wells Fargo's less than arms-length "fire sale" comparables and fraudulent appraisals, Lots 52, 427 and 426 are currently "valued" at $19,560.00, $38,500.00 and $31,420.00, respectively.   But for Wells Fargo's scheme, Dr. Mase's property values would be significantly higher, based upon actual market comparables.

**Defendants**

17.     Defendant Wells Fargo Bank, N.A. (hereinafter referred to as "Wells Fargo") is a

California corporation with its principal place of business in San Francisco, California. Wells Fargo regularly conducted business in the Southern District of Texas.  References to Wells Fargo include Wells Fargo individually, and collectively all divisions and/or subsidiaries.

18.     Defendant Wachovia Bank, N.A. (hereinafter referred to as "Wachovia") is a North Carolina corporation with its principal place of business in Charlotte, North Carolina.  Wachovia regularly conducted business in the Southern District of Texas. References to Wachovia include Wachovia individually, and collectively all divisions and/or subsidiaries.

19.     Defendant Wells Fargo Home Mortgage, Inc. (hereinafter referred to as "Wells Fargo Home Mortgage") is a California corporation with its principal place of business in Des Moines, Iowa.  Wells Fargo Home Mortgage regularly conducted business in the Southern District of Texas. References to Wells Fargo Home Mortgage include Wells Fargo Home Mortgage individually, and collectively all divisions and/or subsidiaries, as well as its successor-in-interest, Home Equity Group. Defendant America's Servicing Company (hereinafter referred to as "America's Servicing Company"), is an assumed name of Wells Fargo Home Mortgage, Inc.

20.     Defendant Wachovia Settlement Services, LLC (hereinafter referred to as "Wachovia Settlement Services") is a Delaware corporation with its principal place of business in Charlotte, North Carolina.  Wachovia Settlement Services regularly conducted business in the Southern District of Texas.

21.     Defendant Greenlink, LLC (hereinafter referred to as "Greenlink") is a wholly owned subsidiary of Wachovia Settlement Services.  Greenlink regularly conducted

business in the Southern District of Texas.

22.    Defendants America's Servicing Company Greenlink, and Wachovia Settlement Services are sometimes collectively referred to herein as "the settlement services companies".

23.    Plaintiffs are uninformed as to the true names and capacities of those Defendants sued herein as DOES 1 through 10, inclusive, and therefore sue said Defendants under such fictitious names. Plaintiffs are informed and believe that such fictitiously named Defendants are responsible in some manner for the events and happenings herein referred to, and proximately caused the damage to Plaintiffs as herein alleged.  Plaintiffs will seek leave to amend this Complaint to allege their true names and capacities when the same have been ascertained.

24.    This Court has original federal question jurisdiction over this class action under 15 U.S.C. §1692k(d) because it is an action to enforce liability created by the Fair Debt Collection Practices Act, 15 U.S.C. §§1692, *et seq.*

25.    This Court has diversity jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregated amount in controversy exceeds five million dollars ($5,000,000.00), exclusive of interest and cost, and a member of a class of plaintiffs is a citizen of a State different from any defendant.  28 U.S.C. §§ 1332(d)(2) and (6).

26.    This Court has supplemental jurisdiction over all the state law claims and causes of action asserted pursuant to 28 U.S.C. §1367(a).

27.    This Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. § 1965 (b) and (d).

28.     The activities of the Defendants, as described herein, have been, and are, within the flow of interstate commerce on a continuous and uninterrupted basis and have had a substantial and continuing effect on interstate commerce.

## IV.  <u>VENUE</u>

29.     The causes of action alleged in this Complaint arose in the Victoria Division of the Southern District of Texas because many of the acts and transactions, and the legal violations alleged, including the unlawful solicitation and procurement of real estate appraisals and evaluations that failed to comply with federal law, regulations and the Uniform Standards of Professional Appraisal Practices ("USPAP"), took place there.  The Defendants transacted business in the Victoria Division of the Southern District of Texas, they continue to conduct business and perpetrate their scheme on a continuous and on-going basis in such district and division, which acts and omissions give rise to the causes of action hereinafter alleged, and therefore make this Court a proper venue for this case.

## V.  <u>THE PLAINTIFF CLASS ALLEGATIONS</u>

30.     This action is brought as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

31.     Plaintiffs and Class Representatives, Sanford Miller, Randy Barfield, David Freeman, Corinthe Freeman, Kimberly Berry, Mack Davis, Elmer Velasco, Carolyn Velasco, R. Kenneth Babb, Chris Stewart, Charles L. Ryan, Joanne F. Hessey, Carl P. Holveck, James Monroe Powell, IV, Kristin Young Powell, Francis Mase, and Tabe Mase, are members of the Plaintiff Class as defined herein, and bring this action on their own behalf and on behalf of those similarly situated.  Plaintiffs seek to recover damages, which they and the Class Members, suffered as a result of the illegal, fraudulent, and

predatory lending practices of Defendants.   The class represented by the Plaintiffs (hereinafter referred to as the "Plaintiff Class") includes all persons and entities, other than the Defendants named herein, who purchased, held or otherwise acquired both directly and indirectly, ownership interest in land or homes in The Sanctuary between January 1, 2006 and the present, except for those who divested their ownership interests prior on or before October 2, 2008 (hereinafter referred to as the "Class Period").

32.     The named Plaintiffs are members of the Plaintiff Class.

33.     Because over $90 million of interests were purchased by over 350 people during the Class Period, the members of the Plaintiff Class are so numerous that joinder of all members is impracticable.   While the exact number of Plaintiff Class Members can only be determined by appropriate discovery, the named Plaintiffs are informed and believe that Class Members number in excess of 200 and the total damages sustained by the Class Members exceed $90 million.

34.     The claims of the named Plaintiffs, Sanford Miller, Randy Barfield, David Freeman, Corinthe Freeman, Kimberly Berry, Mack Davis, Elmer Velasco, Carolyn Velasco, R. Kenneth Babb, Chris Stewart, Charles L. Ryan, Joanne F. Hessey, Carl P. Holveck, James Monroe Powell, IV, Kristin Young Powell, Francis Mase, and Tabe Mase, are typical of the claims of the members of the Plaintiff Class.   Plaintiffs and all members of the Plaintiff Class sustained economic and property damage as a result of the Defendants' wrongful, intentional, and illegal misconduct complained of herein.

35.     Plaintiffs will fairly and adequately protect the interests of the members of the Plaintiff Class and have retained counsel competent and experienced in class action litigation as well as commercial, banking and real estate litigation.

36.     A class action is superior to other available methods for a fair and efficient adjudication of this controversy.  Since the damages suffered by the individual Plaintiff Class Members may be relatively small and geographically diverse, the expense and burden of individual litigation makes it impossible for the Plaintiff Class Members individually to seek redress for the wrongful conduct alleged.

37.     Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a Plaintiff Class action.

38.     Common questions of law and fact exist as to all members of the Plaintiff Class that predominate over questions affecting solely individual members of the class.  Among the questions of law and fact common to the Plaintiff Class are:

(a)     Whether Defendants planned, implemented and perpetrated a scheme and artifice to defraud the Plaintiffs and Class Members as set forth herein;

(b)     Whether Wells Fargo, by virtue of its purchase of Wachovia, holds a larger percentage than any other lender of the typical three (3) to five (5) year balloon notes at The Sanctuary that were entered in the 2006 to 2008 timeframe;

(c)     Whether evaluations or appraisals performed at the behest of Defendants were performed in accordance with Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA");

(d)     Whether evaluations or appraisals performed at the behest of Defendants were performed in accordance with Federal Deposit Insurance Corporation ("FDIC") regulations;

(e)     Whether evaluations or appraisals performed at the behest of Defendants were performed in accordance with the Uniform Standard of Professional Appraisal Practices ("USPAP");

(f)     Whether Wells Fargo communicated a predetermined, expected, or qualifying estimate of value, or a loan amount or target loan-to-value ratio, to any appraiser or person performing an evaluation or appraisal;

(g)     Whether market values of lots and homes at The Sanctuary have been artificially lowered as a result of evaluations or appraisals procured by Defendants;

12

(h)     Whether Wells Fargo had, and has, a financial incentive to realize losses on the balloon notes due to "The Wells Fargo Rule" tax incentive created in the Wachovia purchase transaction;

(i)     Whether Defendants knowingly, intentionally and willfully undertook a "market value manipulation tax savings scheme";

(j)     Whether Defendants' market value manipulation tax savings scheme has damaged Plaintiffs' and Class Members' financial health, credit ratings, the losses of property value, business goodwill, personal reputations, emotional wellbeing, and personal health;

(k)     Whether Defendants' market value manipulation tax savings scheme has affected the property rights and values of each of the foreclosed Plaintiffs and Class members at The Sanctuary;

(l)     Whether Wells Fargo breached its contracts with the Plaintiffs and Class Members with which it contracted;

(m)     Whether Defendants intentionally and tortiously interfered with the existing rights, contracts, promises, agreements, guarantees, amenities and privileges held by the Plaintiffs and each Class Member at The Sanctuary;

(n)     Whether the members of the Plaintiff Class have sustained damages, and if so, the proper measure of damages;

(o)     Whether federal and state banking and appraisal standards, regulations and guidelines enacted under FIRREA were designed to protect the Plaintiff Class from the market value manipulation tax savings scheme as alleged herein;

(p)     Whether Defendants conspired in a civil conspiracy to violate federal and state law;

(q)     Whether Defendants aided and/or abetted each other in violating federal and state law;

(r)     Whether the Plaintiff Class has a remedy under substantive federal law for the wrongs complained of;

(s)     Whether the Plaintiff Class has a remedy under substantive state law for the wrongs complained of;

(t)     Whether exemplary damages should be awarded to Plaintiffs and Class Members and the amount that is appropriate under law;

(u)     Whether, and in what amount, attorneys' fees and costs should be awarded

to the Plaintiffs and Class Members.

## VI.  FACTUAL ALLEGATIONS

39.     The Sanctuary at Costa Grande (hereinafter referred to as "The Sanctuary") is an 800-acre resort development stretching alongside one and a half miles of coastline on the Intracoastal Waterway ("ICW") in Port O'Connor, Calhoun County, Texas.  It has at least 767 single lots and space for thirty-five (35) multi-family lots.   The development's modern and efficient infrastructure is complete. Developers spent more than $60 million completing the development, and it now has over 600 current lot and homeowners that each pay over $2,000/year to maintain the 150-acre marina, bulkhead, boat slips, roads, electrical, plumbing, waterways, lighting, yacht club, boating facilities and clubhouse that features sport courts, swimming pools, a private beach and other amenities.

40.     Beginning in 2006, the 767 lots were made available to qualified buyers across the United States.[1]   During on-site visits, prospective purchasers were solicited by lending institutions, including Wachovia.  Most, if not all, lenders offered a three (3) to five (5) year interest only "balloon" loan that required 10% down, with the assurance that the borrower could always refinance the loan, if necessary, at the end of the three (3) or five (5) year period.  Between 2006 and early 2008, Wachovia loaned over $45 million, which was secured by at least 275 lots.   In the initial phases of the development, approximately 625 lots were sold at prices ranging from $59,000.00 to $500,000.00.

41.     In May of 2006, Wachovia purchased Golden West Financial (hereinafter referred to as "Golden West") for over $25 billion. Golden West, operated then as World Savings

---

[1] Most, if not all, buyers had credit scores of 700 or higher which at that time was considered exceptional.

Bank (hereinafter referred to as "World Savings"), was a major lender in the adjustable rate mortgage market.  Its customers, especially those in its "Pick-A-Pay" program[2], had credit scores well below the industry standard.  Each of the named Plaintiffs herein purchased their Sanctuary lots between 2006 and 2008 – after Wachovia's ill-fated assumption of World Savings' toxic portfolio, but before the 2008 subprime mortgage crisis.

42.     In January of 2008, Bank of America announced its purchase of Countrywide Financial Corporation and in February of the same year, President George W. Bush signed the Economic Stimulus Act of 2008.  In the second quarter of 2008, Wachovia reported an $8.9 billion loss.  Over the intervening seven months, the Federal Reserve Board, the Federal Housing Finance Agency, the Securities and Exchange Commission ("SEC"), the FDIC, and the Treasury Department enacted several measures to deal with the havoc wrought upon the economy by the subprime mortgage crisis.  In the meantime, on July 9, 2008, Wachovia hired Treasury Undersecretary Bob Steel as its Chief Executive.  Steel had been the Treasury's liaison with Wall Street since the fall of 2006, and, at his departure, his boss, Secretary Henry Paulson, praised Steel, saying, "I know he will excel in his future endeavors."

43.     On September 15, 2008, Bank of America announced it was purchasing Merrill Lynch for $50 billion, and Lehman Brothers filed for Chapter 11 bankruptcy protection.  After the September 25, 2008 seizure of Washington Mutual by the Office of Thrift Supervision, Wachovia suffered a "silent run" that resulted in a one-day loss of $5 billion

---

[2] "Pick-A-Pay" allowed borrowers to make monthly mortgage payments that did not cover their interest charges; as a consequence, the total principal owed would actually grow over time, rather than shrink.

in deposits.  On September 28, 2008, Wachovia became the first bank designated as "too

big to fail" and it was announced that Citigroup would buy Wachovia's banking

operations and be allowed to bypass the FDIC's open bank assistance procedures.  Wells

Fargo also made a bid for Wachovia, but it was rejected.

44.     Two days later, on September 30, 2008, and at the request of the Treasury

Department, the Internal Revenue Service (hereinafter referred to as the "IRS") issued

Notice 2008-83:

> *For purposes of section 382(h), any deduction properly allowed*
> *after an ownership change (as defined in section 382(g)) to a bank*
> *(as defined in section 581) with respect to losses on loans or bad*
> *debts (including any deduction for a reasonable addition to a*
> *reserve for bad debts) shall not be treated as a built-in loss or a*
> *deduction that is attributable to periods before the change date.*

Historically, Section 382 of the Internal Revenue Code (hereinafter referred to as the

"Code") prevented profitable companies (like Wells Fargo) from purchasing failing

companies (like Wachovia) in order offset taxable income with their losses.  Ordinarily,

Section 382 limited use of the losses to a small percentage each year following the

change in ownership.  The annual amount allowable was the product of the value of the

loss company's stock multiplied by a defined interest rate.  By late September 2008, the

value of Wachovia stock had fallen to $2 billion (the amount bid by Citigroup).

Assuming an interest rate of 4.65% for ownership changes during September, the

allowable annual deduction to a buyer of Wachovia could have been as low as $93

million.[3]  At that rate, it would have taken almost 800 years to absorb Wachovia's built-

in-losses ("BILs"), 780 years longer than the allowable twenty (20) year carry forward

period.  Stated differently, less than $2 billion of Wachovia's BILs would be deducted

---

[3] Rev. Rul. 2008-46.

16

during the twenty (20) year carry forward period following a sale under the typical Section 382 rules. But IRS Notice 2008-83 changed all of that. It would allow a buyer of Wachovia to, in the words of a Wells Fargo spokeswoman, "accelerate the time when the tax deduction for certain loan losses can be taken."

45.    Suddenly, on October 3, 2008, Wells Fargo announced that it and Wachovia had agreed to merge in an all-stock transaction requiring no FDIC involvement. FDIC Chairwoman Sheila Blair and Wells Fargo CEO Steel called Citigroup CEO Vikram Pandit at 3 a.m. to inform him of the news. Pandit was "stunned." Speaking later, Chairwoman Blair told the Financial Crisis Inquiry Commission that Wells Fargo's Board Chairman Richard Kovacevich informed her that IRS Notice 2008-83 "had been a factor leading to Wells's revised bid." On February 17, 2009, President Barack Obama signed the American Recovery and Reinvestment Act of 2009, repealing IRS Notice 2008-83. However, the statute specified that the IRS "Notice" would thereafter have "the force and effect of law with respect to any ownership change [...] occurring on or before January 16, 2009."[4] Wells Fargo's purchase of Wachovia closed on December 31, 2008, and the "Wells Fargo Rule" was preserved.

46.    It is against this backdrop of tax savings opportunities, and skewed and unusual loss incentives, that the victimization of the Plaintiffs herein became possible. As successor to Wachovia's three (3) to five (5) year notes at The Sanctuary, Wells Fargo found itself holding hundreds of lot loans with borrowers with better than average credit scores who were either in, or about to be in, a position to refinance. However, as the notes neared maturity, Plaintiffs and Class Members were offered oppressive and

---

[4] PL 111-5, §1261(b)(1).

downright unreasonable refinancing terms – $50,000.00 to $100,000.00 in cash for a down payment only to receive a short-term loan with anywhere from nine to fifteen percent interest.  In addition, Wells Fargo made it very clear that no short sales, deeds in lieu of foreclosure, or debt forgiveness would be given to anyone.  Even though the borrowers had healthy incomes and impeccable credit ratings, most were unable to come up with large cash down payments or were unwilling to settle for the one-sided refinancing terms that were offered by Wells Fargo.  But Wells Fargo was in a perfect position – it would receive very favorable, secured loan terms from credit-worthy individuals, or foreclose and realize the losses it had uniquely secured from Wachovia.  It was a no-lose situation for Wells Fargo; but, it had one wrinkle it needed to iron out – values.

47.     By the fall of 2009, Wells Fargo began to "list" its foreclosed properties for sale with a local Coldwell Banker office.  But what it actually did was dump the properties at prices far below market value.  For example, Lot 117, with a choice location along the ICW, was listed for $95,000.00 on December 2, 2009.  However, two identical properties located on the ICW – Lots 116 and 139 in Phase 1 – had sold and closed for $145,000.00 and $130,000.00, respectively, in November 2009 as developer sales.  These two sales were at "market prices" given the current real estate market at the time.  Within a couple of weeks, the asking price of Lot 117 was suddenly dropped 57% to $41,900.00, and by January 31, 2010, after being on the market for only two (2) months, it sold for $38,000.00.

48.     When local appraisers were hired to value foreclosed lots, they were specifically instructed by Wells Fargo to (1) use only foreclosed property sales as comparable sales

and (2) that Wells Fargo "wanted the appraisals lower" than the current true market value of lots within The Sanctuary.  No comparable sales generated by Waterfront Marketing, LLC, The Sanctuary's marketing company, could be used to support an appraisal or evaluation.  Rather, only the most recent and lowest priced comparables were to be used. Wells Fargo even rejected some appraisals (or evaluations) performed by local Texas-based appraisers because they were considered "too high."   In other cases, Wells Fargo requested a "30-day appraisal" which essentially means the price that the market would bear were the property offered for sale for one day only, since it usually takes a minimum of thirty (30) days to close a sale.  The cumulative effect of Wells Fargo's manipulation of the real estate market within The Sanctuary has been to artificially reduce "market" values.  By artificially lowering the lot values, Wells Fargo has been able to execute its strategy that forces customers to pay off their notes or refinance using the low values as the benchmark and require huge down payments.  It has forced many lot owners to default on their loans causing additional "losses" that Wells Fargo has been able to book under its exceptional tax incentive.

49.     While its downward manipulation of the real estate market at The Sanctuary has resulted in more Net Operating Losses ("NOLs") becoming available for use in reducing Wells Fargo's tax liabilities, it has negatively affected all owners at The Sanctuary – not only the Wachovia/Wells Fargo borrowers.  Wells Fargo has manipulated the real estate market at The Sanctuary through the use of appraisals that violate FIRREA, FDIC regulations and USPAP.  As a result of Wells Fargo's fraudulent behavior, many Plaintiffs have lost their entire life savings, business owners have lost lines of credit at their respective banks, and others have had their once near perfect credit scores destroyed

seemingly overnight.  Other Plaintiffs have experienced severe emotional distress and mental anguish in addition to physical health problems.

50.    By requesting that appraisers opine at certain values, that they ignore certain comparable sales, and by requiring USPAP and other sound and reasonable valuation method violations, Wells Fargo has violated, and continues to violate, safe and sound banking practices and therefore, applicable federal regulations, laws, and guidelines, among them:  12 C.F.R. §§ 323 (a) or (b); 12 C.F.R. § 323.4, as well as their enabling statutes, 12 U.S.C. § 1818, 1819, and Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") 12 U.S.C. 3331 *et seq., and, FDIC Financial Institution Letter (FIL--74--94).*[5]

51.    In the refinance, workout, and foreclosure avoidance (successful and unsuccessful) negotiations with Wachovia borrowers at The Sanctuary, Wells Fargo failed, and continues to fail, to keep independent from each other the credit underwriting processes and personnel, and the loan production staff.  These failures were, and continue to be, a violation of both the 1994 Interagency Guidelines and the December 10, 2010 guidelines.

52.    By utilizing evaluations and appraisals that violate 12 C.F.R. §§ 323 (a) or (b); 12 C.F.R. § 323.4, as well as their enabling statutes, 12 U.S.C. §§ 1818, 1819, and Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") 12 U.S.C. 3331 *et seq.,* and FDIC Financial Institution Letter (FIL--74--94), Wells Fargo failed to follow sound banking practices.

---

[5] The Interagency Appraisal and Evaluation Guidelines were amended, effective December 10, 2010, and published at 75 FR 77450.  They rescinded the 1994 guidelines cited; however, to the extent they apply to this matter their restrictions are even more onerous than those cited and have also been violated.

53.     Wells Fargo holds, or has held, notes on as much as approximately 45% of the total number of lots at The Sanctuary.   Under such circumstances, it is reasonably foreseeable that if a lender in such a position undertook the market value manipulation tax savings scheme described herein, it would cause the values of real estate in the development to drastically trend lower under the pressure of such scheme.   The federal laws, regulations and guidelines cited herein were designed to prevent distorted appraisals or evaluations, founded on factors other than true market value, to jeopardize federally-insured banks, and, the very real estate markets within which such lenders and their borrowers operate.   It was, and is, reasonably foreseeable that Wells Fargo's manipulation of the real property values at The Sanctuary would cause the exact damages that have been suffered by the Plaintiffs and Plaintiffs Class herein because had true market values been allowed to guide the lending and borrowing described herein – as the cited federal laws, regulations and guidelines prescribed – then the Plaintiffs and Plaintiff Class would not have suffered the damages that are solely a result of the artificially low "market" values.

54.     Upon information and belief, Wells Fargo has either already booked the losses that it has artificially created, or is in the process of doing so.   Under either scenario, its market value manipulation tax savings scheme is fraudulently reducing its tax burden, and/or is an unlawful attempt to justify a prior ill-gotten tax savings.

## VII.  PLAINTIFFS' CAUSES OF ACTION

## Civil Liability under Fair Debt Collection Practices Act (15 USC §1692k)

55.     Plaintiffs adopt and incorporate by reference and repeat verbatim herein, the allegations contained in Paragraphs 1 through 54, the same as if set forth fully hereafter

in this Section VII.  Each Defendant used false, deceptive, or misleading representations or means in connection with the collection of debt, or false representations or deceptive means to collect or attempt to collect debt.  Such acts of omission or commission include, but are not limited to, false representations regarding the character, amount, or legal status of debt.  Defendants are, therefore, liable to each Plaintiff and Plaintiff Class Member for any actual damage sustained by such person as a result of such failure.  In addition, in the case of any action by an individual, such additional damages as the court may allow, but not exceeding $1,000.00; or, in the case of class certification, such actual damages, and such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $500,000.00 or one (1) per cent of the net worth of the liable defendants; and, court costs and reasonable attorney's fee as determined by the court.

56.     At all material times, Defendants' downward manipulation of the real estate market at The Sanctuary was rooted in false, deceptive, or misleading representations or means in connection with wrongful foreclosures and fraudulent appraisals.  Had Defendants not engaged in those unfair debt collection practices, the Plaintiff Class would not have lost significant amounts of money, had their credit ratings ruined, lost out on future business dealings, or experienced severe emotional stress and mental anguish.

57.     The course of action, conduct, acts, and omissions alleged constitute unfair debt collection practices upon the Plaintiff Class, and were a direct, producing and proximate cause of injury and damages to the Plaintiff Class.  Such unfair debt collection practices were a substantial factor in bringing about the injury and damages to the Plaintiff Class, and without such unfair debt collection practices, the injury and damages would not have

occurred.   Moreover, a person of ordinary intelligence would have foreseen that the injury and damages alleged herein might result from those unfair debt collection practices.

**Civil Liability under the Texas Debt Collection Act**

58.      Plaintiffs adopt and incorporate by reference and repeat verbatim herein, the allegations contained in Paragraphs 1 through 57, the same as if set forth fully hereafter in this Section VII.  Each Defendant used false representations or deceptive means to collect a debt, and, used one or more fraudulent, deceptive, or misleading representations regarding the character, extent, or amount of Plaintiffs' debt.  Plaintiffs seek injunctive relief to prevent or restrain the Defendants' violations of the Texas Debt Collection Act, actual damages sustained as a result of such violations, and attorney's fees reasonably related to the amount of work performed and costs.

59.      At all material times, Defendants' use of fraudulent appraisals and wrongful foreclosures were done in an attempt to falsely represent the value of lots in The Sanctuary and thereby unfairly collect misrepresented debt.  Had Defendants not engaged in those unfair debt collection practices, the Plaintiff Class would not have lost significant amounts of money, had their credit ratings ruined, lost out on future business dealings, or experienced severe emotional stress and mental anguish.

60.      The course of action, conduct, acts, and omissions alleged constitute unfair debt collection practices upon the Plaintiff Class, and were a direct, producing and proximate cause of injury and damages to the Plaintiff Class.  Such unfair debt collection practices were a substantial factor in bringing about the injury and damages to the Plaintiff Class, and without such unfair debt collection practices, the injury and damages would not have

occurred.   Moreover, a person of ordinary intelligence would have foreseen that the injury and damages alleged herein might result from those unfair debt collection practices.

**Texas Deceptive Trade Practices Act**

61.     Plaintiffs adopt and incorporate by reference and repeat verbatim herein, the allegations contained in Paragraphs 1 through 60, the same as if set forth fully hereafter in this Section VII.  This matter is also brought pursuant to the Deceptive Trade Practices – Consumer Protection Act, codified at § 17.41, *et seq.*, of the Texas Business & Commerce Code (hereinafter "*DTPA §* _____").   Plaintiffs are consumers as defined in DTPA § 17.45(4).  Defendants violated the DTPA by engaging in an unconscionable action or course of action that, to Plaintiffs' detriment, took advantage of Plaintiffs' lack of knowledge, ability, experience, or capacity to a grossly unfair degree.  Specifically, Defendants' scheme to drive down the appraisal value of foreclosed lots, to sell those lots at rock bottom prices thereby further manipulating the surrounding market, and to then reap the tax benefits imposed by the Wells Fargo Rule by reporting "losses" on the original Wachovia-owned lots to the IRS.  Economic damages suffered by Plaintiffs as a result of the foregoing violations of the DTPA are well in excess of $200,000.00, for which Plaintiffs hereby sue.  The foregoing violations of the DTPA were severally and jointly the producing cause of losses and damages sustained by Plaintiffs, all of which exceed the minimum jurisdictional limits of this Court, for which Plaintiffs hereby sue. All of the violations of the DTPA were made knowingly by Defendants, and occurred at a time when the true facts were known to Defendants.  Thus, Plaintiffs seek an award of

discretionary damages in an amount not to exceed three times the economic actual damages as authorized by DTPA § 17.50(b)(1).

**Fraud by Non-Disclosure**

62.     Plaintiffs adopt and incorporate by reference and repeat verbatim herein, the allegations contained in Paragraphs 1 through 61, the same as if set forth fully hereafter in this Section VII.  At all times material to this cause, Defendants had a duty to discover and fully disclose the true value of lots in The Sanctuary.  Defendants actively concealed such facts and failed to disclose these material facts to Plaintiffs.  Further, Defendants knew that Plaintiffs did not know that their property values had been manipulated by fraudulent appraisals and that Plaintiffs did not have an equal opportunity to discover the true value of lots within The Sanctuary.  Defendants were deliberately silent despite a duty to disclose such information to Plaintiffs.  Defendants intended to and did induce Plaintiffs into wrongful foreclosure and premature debt relief programs.   Plaintiffs relied on the failure to disclose the true value of lots within The Sanctuary to their detriment, and Plaintiffs suffered injury as result of acting without knowledge of the undisclosed true value of lots within The Sanctuary.

63.     Had Defendants not perpetrated a fraud by nondisclosure, Plaintiffs would not have had their credit ratings destroyed, lost significant amounts of money, lost out on future business dealings, or experienced severe emotional stress and mental anguish.

64.     The course of action, conduct, acts, and omissions alleged constituted a fraud by nondisclosure upon Plaintiffs, and were a direct, producing and proximate cause of injury and damages to Plaintiffs.  Such fraud by nondisclosure was a substantial factor in bringing about injury and damages to Plaintiffs, and without such fraud by nondisclosure,

the injury and damages would not have occurred.   Moreover, a person of ordinary intelligence would have foreseen that the injury and damages alleged herein might result from the fraud by nondisclosure.

**Statutory Fraud**

65.    Plaintiffs adopt and incorporate by reference and repeat verbatim herein, the allegations contained in Paragraphs 1 through 64, the same as if set forth fully hereafter in this Section VII.   Defendants are liable to Plaintiffs for Statutory Fraud pursuant to Texas Business & Commerce Code § 27.01.   At all material times, the transactions in question involved real estate.   Throughout the transactions complained of herein, and by and through the acts, omissions, conduct and misconduct alleged herein, Defendants' made material false misrepresentations of fact, made false promises and/or benefited by not disclosing that a third party's representations or promises were false that concerned or related to the value of lots in The Sanctuary.    Defendants' misrepresentations of the true market value of the lots in The Sanctuary was a knowingly false representation of past or existing material fact and was made with actual awareness and for the specific purpose of inducing Plaintiffs to act, or refrain from acting, based upon such misinformation. Plaintiffs relied on these false representations or promises by entering into wrongful foreclosures and premature and unnecessary debt relief.

66.    Had Defendants not perpetrated a statutory fraud pursuant to Texas Business & Commerce Code § 27.01, Plaintiffs would not have had their credit ratings destroyed, lost significant amounts of money, lost out on future business dealings, or experienced severe emotional stress and mental anguish.   Further, and as a result of Defendants' actual

26

awareness of the falsity of their representations about the true value of lots in The Sanctuary, Plaintiffs are entitled to exemplary damages.

67.     The course of action, conduct, acts, and omissions alleged constituted statutory fraud pursuant to Texas Business & Commerce Code § 27.01 upon Plaintiffs, and were a direct, producing and proximate cause of injury and damages to Plaintiffs.  Such statutory fraud pursuant to Texas Business & Commerce Code § 27.01 was a substantial factor in bringing about injury and damages to Plaintiffs, and without such statutory fraud pursuant to Texas Business & Commerce Code § 27.01, the injury and damages would not have occurred.  Moreover, a person of ordinary intelligence would have foreseen that the injury and damages alleged herein might result from the statutory fraud pursuant to Texas Business & Commerce Code § 27.01.

**Negligence**

68.     Plaintiffs adopt and incorporate by reference and repeat verbatim herein, the allegations contained in Paragraphs 1 through 67, the same as if set forth fully hereafter in this Section VII.  The damages suffered by the Plaintiffs and Class was a reasonably foreseeable result of the acts and omissions undertaken by the Defendants.  Further, Defendants' acts and omissions constitute violations of FIRREA, FDIC regulations and USPAP.  Plaintiffs plead that Defendants' status and activities as regulated entities under the FIRREA, FDIC regulations and guidelines, the Fair Debt Collection Act, and Texas' Debt Collection Act compelled them to follow standards of care contained within such statutes (and its implementing regulations), and that failure to do so constituted negligence.  In addition, under a under a traditional risk/utility analysis, a duty of reasonable care should be imposed on Defendants, and through the acts and omissions

described herein, it was repeatedly violated and has damaged each Plaintiff and Class Member.  Moreover, Texas imposes a duty of reasonable care on each Defendant to the extent it voluntarily undertook to perform lending or collection activities.  Defendants were under a duty to perform such activities in a reasonable and prudent manner, the failure of which constituted acts of omission and commission, which collectively and severally constitute negligence.  Such negligence was a proximate cause of Plaintiffs' damages.

69.     Damages and remedies sought by Plaintiffs for the negligence alleged herein include but are not limited to the loss of credit, the loss of significant amounts of money, the loss of future business dealings, severe emotional stress and mental anguish, reasonable and equitable attorneys' fees, exemplary damages, prejudgment and post judgment interest, and court costs, including but not limited to expert witness fees and fees for depositions.

**Wrongful Foreclosure**

70.     Plaintiffs adopt and incorporate by reference and repeat verbatim herein, the allegations contained in Paragraphs 1 through 69, the same as if set forth fully hereafter in this Section VII.  Wells Fargo made self-serving bids for lots at foreclosure sales which were artificially and fraudulently low and unrelated to market value, having been calculated with the intent of minimizing the lot acquisition costs and maximizing their reported "losses" to the IRS.  The appraisals and evaluations procured in violation of federal banking laws and regulations resulted in defects in the foreclosure sale proceedings; grossly inadequate sales prices; and, such defects proximately resulted in the grossly inadequate selling prices.  As such, each foreclosure by Wells Fargo in The

Sanctuary was a wrongful foreclosure.  Moreover, each Plaintiff who was forced into a wrongful foreclosure has received a deficiency along with a 1099 that must be submitted to the IRS for supposed "income."

71.    Damages and remedies sought by Plaintiffs for the wrongful foreclosures alleged herein include but are not limited to the loss of real property, improper deficiency amounts, rescission, loss of credit, the loss of significant amounts of money, the loss of future business dealings, severe emotional stress and mental anguish, reasonable and equitable attorneys' fees, exemplary damages, prejudgment and post judgment interest, and court costs, including but not limited to expert witness fees and fees for depositions.

**Texas Common Law Unreasonable Debt Collection**

72.    Plaintiffs adopt and incorporate by reference and repeat verbatim herein, the allegations contained in Paragraphs 1 through 71, the same as if set forth fully hereafter in this Section VII.  Each Defendant's acts of omission and commission described herein that constitute all, or a part, of the market value manipulation tax savings scheme were efforts that amount to a course of harassment that was willful, wanton, malicious and intended to inflict mental anguish and bodily harm.

73.    Damages and remedies sought by Plaintiffs for the unreasonable debt collections alleged herein include but are not limited to the loss of credit, the loss of significant amounts of money, the loss of future business dealings, severe emotional stress and mental anguish, reasonable and equitable attorneys' fees, exemplary damages, prejudgment and post judgment interest, and court costs, including but not limited to expert witness fees and fees for depositions.

**Negligent Misrepresentation**

74.      Plaintiffs adopt and incorporate by reference and repeat verbatim herein, the allegations contained in Paragraphs 1 through 73, the same as if set forth fully hereafter in this Section VII.  Defendants negligently misrepresented the true appraisal values of lots within The Sanctuary.  Each Plaintiff and Class Member detrimentally relied on these negligent misrepresentations and suffered pecuniary losses.  As a result, Defendants are liable to Plaintiffs for negligent misrepresentation.

75.      Damages and remedies sought by Plaintiffs for the negligent misrepresentation alleged herein include but are not limited to the loss of credit, the loss of significant amounts of money, the loss of future business dealings, severe emotional stress and mental anguish, reasonable and equitable attorneys' fees, exemplary damages, prejudgment and post judgment interest, and court costs, including but not limited to expert witness fees and fees for depositions.

**Intentional Infliction of Emotional Distress**

76.      Plaintiffs adopt and incorporate by reference and repeat verbatim herein, the allegations contained in Paragraphs 1 through 75, the same as if set forth fully hereafter in this Section VII.  Defendants acted intentionally or recklessly with extreme and outrageous conduct to cause Plaintiffs emotional distress and the emotional distress suffered by Plaintiffs was severe.  Several Plaintiffs have lost their life savings and had their collective credit ratings ruined.  As a direct result of Defendants' misconduct, Plaintiffs and the Plaintiff Class have experienced embarrassment, fright, horror, grief, shame, humiliation, and/or worry.

77.     Damages and remedies sought by Plaintiffs for the intentional infliction of emotional distress alleged herein include but are not limited to the loss of credit, the loss of significant amounts of money, the loss of future business dealings, severe emotional stress and mental anguish, reasonable and equitable attorneys' fees, exemplary damages, prejudgment and post judgment interest, and court costs, including but not limited to expert witness fees and fees for depositions.

**<u>Gross Negligence</u>**

78.     Plaintiffs adopt and incorporate by reference and repeat verbatim herein, the allegations contained in Paragraphs 1 through 77, the same as if set forth fully hereafter in this Section VII.  The wrong(s) done by Defendants in deliberately driving down the appraisal values of lots within The Sanctuary, manipulating the real estate market within The Sanctuary, and then reaping the tax benefits from its fraudulent scheme was aggravated by the kind of gross negligence, malice and disregard for which the law and equity require the imposition of exemplary damages.  The conduct of Defendants, when viewed objectively from Defendants' standpoint at the time of the conduct, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Defendants were actually and subjectively aware of the risk involved, but nevertheless proceded with conscious indifference to the rights or welfare of others. Plaintiffs therefore seek exemplary damages against Defendants.

79.     Damages and remedies sought by Plaintiffs for the gross negligence alleged herein include but are not limited to the loss of credit, the loss of significant amounts of money, the loss of future business dealings, severe emotional stress and mental anguish, reasonable and equitable attorneys' fees, exemplary damages, prejudgment and post

judgment interest, and court costs, including but not limited to expert witness fees and fees for depositions.

**Unjust Enrichment**

80.     Plaintiffs adopt and incorporate by reference and repeat verbatim herein, the allegations contained in Paragraphs 1 through 79, the same as if set forth fully hereafter in this Section VII.  Every dollar of tax savings that Wells Fargo has realized as a result of the market value manipulation tax savings scheme is an unjust enrichment of Wells Fargo because it wrongfully secured a benefit or passively received one which would be unconscionable to retain. *See City of Corpus Christi v. S.S. Smith & Sons Masonry, Inc.*, 736 S.W.2d 247, 250 (Tex. App.—Corpus Christi 1987, writ denied).  Wells Fargo was unjustly enriched when it, among other bad acts, fraudulently and artificially drove down lot values within The Sanctuary, then sold these lots for pennies on the dollar (amounts that were grossly under their actual value), and ultimately reported "losses" to the IRS thereby gaining tax benefits.   Plaintiffs seek and are entitled to recover damages commensurate with the unjust enrichment of Wells Fargo, including but not limited to the loss of credit, the loss of significant amounts of money, the loss of future business dealings, severe emotional stress and mental anguish, reasonable and equitable attorneys' fees, exemplary damages, prejudgment and post judgment interest, and court costs, including but not limited to expert witness fees and fees for depositions.

**Civil Conspiracy**

81.     Plaintiffs adopt and incorporate by reference and repeat verbatim herein, the allegations contained in Paragraphs 1 through 80, the same as if set forth fully hereafter in this Section VII.  At all material times, Wells Fargo, Wachovia and the respective

settlement services company co-Defendants participated in a conspiracy to defraud Plaintiffs for their own respective financial gain.  Defendants had a meeting of the minds to plan and implement the market value manipulation tax savings scheme that, among other things, fraudulently and artificially decreased the appraisal and/or evaluation values of lots in The Sanctuary.   Wells Fargo then reaped the financial benefits of this arrangement in the form of tax savings.  By the facts, acts, and omissions alleged herein, the objective of the combination was to accomplish an unlawful purpose and/or to accomplish a lawful purpose by unlawful means, the members of the combination had a meeting of the minds on the object or course of action, and at least one or more of the members, as alleged herein, committed an unlawful, overt act to further the object or course of action.

82.    Plaintiffs suffered injury and damages as a direct and proximate result of the wrongful act, including but not limited to the loss of credit, the loss of significant amounts of money, the loss of future business dealings, severe emotional stress and mental anguish, reasonable and equitable attorneys' fees, exemplary damages, prejudgment and post judgment interest, and court costs, including but not limited to expert witness fees and fees for depositions.  The civil conspiracy alleged herein, and the individual predicate misconduct, wrongful acts and omissions alleged, were a direct, producing and proximate cause of injury and damages to Plaintiffs.  The civil conspiracy alleged herein, and the individual predicate misconduct, wrongful acts and omissions alleged were a substantial factor in bringing about the injury and damages would not have occurred.   Moreover, a person of ordinary intelligence would have foreseen that the

damages alleged herein might result from the civil conspiracy alleged herein, and the individual predicate misconduct, wrongful acts and omissions alleged.

**Aiding or Abetting**

83. Plaintiffs adopt and incorporate by reference and repeat verbatim herein, the allegations contained in Paragraphs 1 through 82, the same as if set forth fully hereafter in this Section VII. By the course of conduct, acts and omissions alleged herein, the settlement services companies intentionally aided and abetted, by assisting and participating with, and by assisting or encouraging Wells Fargo to commit one or more individual torts as alleged herein. By the course of conduct, acts and omissions alleged herein, the settlement services companies also intentionally aided and abetted, by assisting and participating with, and by assisting or encouraging Wells Fargo in the civil conspiracy as alleged herein. With respect to assisting or encouraging, Wells Fargo committed a tort as alleged herein, and the settlement services companies (a) had knowledge that the primary actor's conduct constituted a tort; (b) had the intent to assist the primary actor in committing the tort; (c) gave the primary actor assistance or encouragement; and (d) its assistance or encouragement was a substantial factor in causing the tort. With respect to assisting and participating, (a) the primary actor's activity accomplished a tortious result as alleged herein, and the settlement services companies (a) provided substantial assistance to the primary actor in accomplishing the tortious result; (b) their own conduct, separate from the primary actor's conduct, was a breach of duty to Plaintiffs; and (c) their participation was a substantial factor in causing the tort.

84.     Damages and remedies sought by Plaintiffs for the aiding and abetting alleged herein, and the individual predicate torts, wrongful acts and omissions alleged include but are not limited to the loss of credit, the loss of significant amounts of money, the loss of future business dealings, severe emotional stress and mental anguish, reasonable and equitable attorneys' fees, exemplary damages, prejudgment and post judgment interest, and court costs, including but not limited to expert witness fees and fees for depositions.

## VIII.   CONDITIONS PRECEDENT

85.     All conditions precedent, if any, to the claims and causes of action alleged herein have been met, waived or are excused.

## IX.  JURY DEMAND

86.     Plaintiffs hereby make application for a jury trial and request that this cause be set on the Court's Jury Docket.  In support of his application, the appropriate jury fee has been paid to the Clerk at least thirty (30) days in advance of the trial setting.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs Sanford Miller, Randy Barfield, David Freeman, Corinthe Freeman, Kimberly Berry, Mack Davis, Elmer Velasco, Carolyn Velasco, R. Kenneth Babb, Chris Stewart, Charles L. Ryan, Joanne F. Hessey, Carl P. Holveck, James Monroe Powell, IV, Kristin Young Powell, Francis Mase, and Tabe Mase pray for a trial before a jury of their peers, a judgment against the defendants, jointly and severally, for actual and exemplary damages, prejudgment and post judgment interest, attorneys fees, costs, and all other and further relief, at law, or in equity, to which they may be reasonably entitled.

Respectfully submitted,

/s/ Craig M. Sico
Craig M. Sico
Federal I.D. NO. 13540
Texas Bar No. 18839850
SICO, WHITE, HOELSCHER & BRAUGH, L.L.P
802 N. Carancahua, Suite 900
Corpus Christi, Texas 78401
Telephone: 361-653-3300
Facsimile: 361-653-3333

**ATTORNEY IN CHARGE FOR PLAINTIFFS**

Of counsel:

Roger S. Braugh, Jr.
Federal I.D. No. 21326
Texas Bar No. 00796244
SICO, WHITE, HOELSCHER & BRAUGH, L.L.P
802 N. Carancahua, Suite 900
Corpus Christi, Texas 78401
Telephone: 361-653-3300
Facsimile: 361-653-3333

John Flood
Federal I.D. No. 12593
Texas Bar No. 07155910
FLOOD & FLOOD
802 N. Carancahua, Suite 900
Corpus Christi, Texas 78401
Telephone: 361-654-8877
Facsimile: 361-654-8879

Michael Johnson
Federal I.D. No. 8137
Texas Bar No. 10770700
121 S. Main Street
P. O. Box 1667
Victoria, Texas 77902
Telephone:  361-579-6700
Facsimile: 361-485-0465