UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

MACK DAVIS, *et al*,               §
                                   §
          Plaintiffs,              §
VS.                                §          CIVIL ACTION NO. 6-11-CV-47
                                   §
WELLS FARGO BANK, N.A., *et al*,   §
                                   §
          Defendants.              §

## MEMORANDUM AND ORDER

The real estate at issue in this proposed class action is part of an 800-acre development along the mid-Gulf Coast of Texas.  But the allegations of fraud reach back to decisions made in Washington and Wall Street during the height of the financial crisis in the fall of 2008.  In the spasm of bank merger activity that occurred during that period, when troubled banks bought their even more troubled brethren, Wells Fargo purchased Wachovia.  As a result, Wells Fargo took on the mortgage loans that Wachovia had made to Plaintiffs to fund their real estate purchases at the development in Port O'Connor, Texas.

Plaintiffs contend that a special and short-lived IRS rule aimed at encouraging the bank merger activity caused Wells Fargo to have "unusual loss incentives" resulting in its "victimization" of Plaintiffs when their loans came due. Pls.' First Amended Complaint, Docket Entry No. 23 ¶ 40.  The temporary tax change removed the limit on the amount of loan losses from an acquired bank's

balance sheet that an acquiring bank could deduct.  Plaintiffs contend that as a result of this increased ability to deduct losses on Wachovia loans, Wells Fargo sold the homes at below market prices, instead of offering reasonable refinancing terms, when balloon payments came due on Plaintiffs' interest-only loans around 2009.   A principal allegation of fraudulent activity supporting this "market value/tax manipulation scheme" is that Wells Fargo instructed appraisers to use only foreclosure sales as comparable because, as it supposedly told one appraiser, it "wanted the appraisals lower."  *Id.* ¶ 44–45.

This overall scheme serves as the basis for fourteen different state and federal claims Plaintiffs assert against the Defendants: Wells Fargo Bank N.A., Wachovia Bank, N.A.; Greenlink LLC; Wells Fargo Home Mortgage, Inc.; America's Servicing Company; and several unnamed real estate appraisers.[1]  Wells Fargo filed a motion to dismiss contending that Plaintiffs' alleged scheme is implausible on its face, that federal law preempts some of the state law claims, that the economic loss rule precludes the tort claims, and that the individual causes of action fail to state a claim.   For the reasons that follow, the Court rejects Defendants' general plausibility, preemption, and "economic loss rule" challenges, but finds that a number of the claims are legally insufficient under the facts

---

[1] Wells Fargo contends that the other business entities named as defendants are either its subsidiaries or have dissolved.  The "John Doe" appraisers named as defendants have not been served or appeared.

alleged.   Accordingly, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART** as discussed below.

## I.   BACKGROUND

### A.   The Sanctuary[2]

The Sanctuary at Costa Grande is an 800-acre development with 767 single lots located along 1.5 miles of the Intercoastal Waterway in Port O'Connor. Development of The Sanctuary—which involved the construction of roads, a marina, clubhouse, plumbing, and electricity service—cost more than $60 million. Beginning in 2006, developers began selling the lots.   The seventeen individual Plaintiffs—most of whom reside outside of Texas—purchased their lots between 2006 and 2008 under three- to five-year interest-only loans from Wachovia Bank, N.A.   The loans required 10% down and a large balloon payment at the end of the loan term, but—according to Plaintiffs—came "with the assurance that the borrower could always refinance the loan, if necessary," at the end of the three- or five-year term. Docket Entry No. 23 ¶ 34.   The loan agreements did not, however, guarantee any particular refinancing terms.

---

[2] The following background is based on the allegations in the Plaintiffs' Corrected First Amended Complaint (Docket Entry No. 23), which the Court must accept as true as this stage of the case.

**B.     Wells Fargo Acquires The Sanctuary Loans During The 2008 Financial Crisis**

Wells Fargo acquired these loans when it merged with Wachovia during the financial crisis of 2008.  The circumstances surrounding that merger form a core part of the allegations in this case.

During the 2008 financial crisis, Wachovia posted a second-quarter loss of $8.9 billion and suffered a one-day loss of $5 billion in deposits.  That balance sheet made it one of the "too big to fail" institutions that were the subject of frenzied merger talks, often at government prodding.  Wells Fargo made an offer for Wachovia that was rejected.  Then an announcement was made that Citigroup would buy Wachovia for $2 billion under a deal that would allow Citigroup to bypass certain Federal Deposit Insurance Corporation procedures.

But another government incentive prompted Wells Fargo to up its earlier bid for Wachovia.  On September 30, 2008, the Internal Revenue Service issued Notice 2008-83.  That notice provided that: "For purposes of section 382(h), any deduction properly allowed after an ownership change . . . with respect to losses on loans or bad debts . . . shall not be treated as a built-in loss or a deduction that is attributable to periods before the change date."  Section 382 had previously limited the amount of an acquired company's losses that an acquiring company could deduct to a small percentage of the acquired company's stock value.  This prevented mergers aimed at acquiring a company for its potential to generate tax

losses.  Given the plummeting value of Wachovia's stock, Plaintiffs contend that the historical Section 382 would have limited a buyer's allowable annual deduction for Wachovia's bad loans to a figure "as low as $93 million."  Docket Entry No. 23 ¶ 38.    But—with Notice 2008-83 substantially accelerating the allowable deductions for the acquired company's loan losses—the company acquiring Wachovia would be able to claim billions in tax deductions in the years following a merger.

Three days after the announcement of this change in tax law, instead of consummating the expected sale to Citigroup, Wachovia announced an all-stock merger with Wells Fargo that required no FDIC involvement.  FDIC chairwoman Sheila Bair later testified that Wells Fargo's chairman had informed her that IRS Notice 2008-83 "had been a factor leading to Wells's revised bid." *Id.* ¶ 39; Sheila Bair, *Interview by Fin. Crisis Inquiry Comm'n*, Aug. 18, 2010. The Wells Fargo–Wachovia merger closed on December 31, 2008.

The IRS notice sparked congressional criticism, in particular because of the large tax benefit it provided Wells Fargo for the Wachovia purchase.  As a result, the American Recovery and Reinvestment Act, signed on February 17, 2009, repealed IRS Notice 2008-83.  But the Act retained the effect of Notice 2008-83 on any ownership change that occurred before January 16, 2009.  As a result, Wells Fargo would continue to receive accelerated tax deductions for any loss on a loan

that it acquired as a result of its merger with Wachovia.  It is this unique tax treatment that Plaintiffs contend created an incentive for the fraud scheme that Wells Fargo allegedly commenced in 2009 when the Sanctuary mortgage loans started to come due.

### C.    The Sanctuary Loans Come Due

Plaintiffs contend that when their short-term (3 or 5 year) interest-only loans started to come due which required the balloon payment, they had "better than average credit scores" and were in a "position to refinance."  Docket Entry No. 23 ¶ 40.  But Wells Fargo offered "oppressive and unreasonable refinancing terms" and refused to allow "short sales, deeds in lieu of foreclosure, or debt forgiveness." *Id*.  The IRS Notice put Wells Fargo in what Plaintiffs call "a perfect position—it would receive very favorable, secured loan terms from credit-worthy individuals, or foreclose and realize the losses it had uniquely secured from Wachovia." *Id*.

Plaintiffs contend that this "no-lose situation" led Wells Fargo to embark on its market manipulation scheme.  It began during the fall of 2009 when Wells Fargo allegedly dumped two foreclosure properties at "prices far below market value." *Id.* ¶ 41.  One of those was waterfront Lot 117.  Lot 117 was listed for $95,000 on December 2, 2009 even though two "identical" properties had sold for $145,000 and $130,000 the previous month, and eventually sold for a mere $38,000. *Id*.

These initial foreclosure sales then became the basis for subsequent appraisals of foreclosed Sanctuary homes—appraisals that Plaintiff contends were themselves illegal.  According to a local appraiser the First Amended Complaint identifies as "Appraiser A", Wells Fargo and the mortgage servicing companies would not accept his appraisals because he used sales by the developer and other nonforeclosure sales as comparables.  *Id.* ¶ 43.  Appraiser A refused to follow Wells Fargo's desire for foreclosure-only comps because he believed the Uniform Standards of Professional Appraisal Practice (USPAP) prohibits that practice. After Appraiser A refused to comply with Defendants' directions, Wells Fargo and the servicing companies started to use two other appraisers, designated Appraisers B and C.  Plaintiffs allege that Appraisers B and C were instructed to use only foreclosure sales as comparables and that Wells Fargo "wanted the appraisals lower" than actual market value.  *Id.* ¶ 44.  Plaintiffs further allege that Wells Fargo rejected appraisals performed by others because they were "too high" and requested "30-day appraisals" which consider only the price that a home would sell for if on the market for one day, as it takes at least 30 days to close.  *Id.*

Plaintiffs then allege that these appraisals—which they contend "violate federal and state laws and regulations," *id.* ¶ 47—set the market for the foreclosure sales.  The resulting artificially low foreclosure sales allowed Wells Fargo both to claim a large tax deduction on the loan (because of IRS Notice 2008-83), and,

when it purchased the homes at foreclosure, to obtain a profit when it resold the homes at the higher, market rates. *Id.* ¶¶ 45–47.

The First Amended Complaint details the effect of this alleged scheme on each of the named Plaintiffs. *See id.* ¶¶ 48–62. Some of the named Plaintiffs have already had homes sold at foreclosure sales. One such couple, David and Corinthe Freeman, purchased a Sanctuary lot in 2007 for $225,880 with a loan from Wachovia. In December 2010, the lot sold at a nonjudicial foreclosure sale for $76,150. *Id.* ¶ 48. Others still own their homes, but seek damages for the decreased value of their properties resulting from Wells Fargo's alleged market manipulation, as well as for emotional distress and other consequential damages. For example, Sanford Miller and Randy Barfield purchased three lots totaling approximately $795,000, all financed through Wachovia loans. Miller attempted to obtain new financing from Wells Fargo, which informed him that the terms would require a 60% down payment and 9% interest. *Id.* at ¶ 49. A Wells Fargo representative allegedly told Miller that the bank "did not care whether or not Mr. Miller defaulted, or was foreclosed on, because Wells Fargo was guaranteed to get paid on Mr. Miller's Loans through the federal loan loss guarantee." *Id.* ¶ 50. Miller contends that Wells Fargo's conduct has damaged his credit rating, hindering his efforts to obtain financing for his business, and devalued his lots. *Id.* ¶ 52.

### D.    The Lawsuit

Plaintiffs filed this suit as a proposed class action.  Because the complaint included a claim under the Texas Deceptive Trade Practices Act (DTPA), the district court abated the case pending Plaintiffs' compliance with the written notice provisions of that statute.   After Plaintiffs complied with the DTPA notice provision, Defendants filed a motion to dismiss the original complaint, after which Plaintiffs filed their First Amended Complaint.   Defendants then filed a new motion to dismiss, and the case was reassigned to this Court.  Given the number and complexity of the arguments, the Court held oral argument.

Plaintiffs' 46-page First Amended Complaint asserts fourteen claims.[3]  Five are statutory, brought under the National Banking Act (for usury); the federal Fair Debt Collection Practices Act; the Texas Debt Collection Act; the DTPA; and the "statutory fraud" provisions of Texas Business and Commerce Code § 27.01. Seven are substantive common law claims, for unreasonable debt collection; wrongful foreclosure; fraud by nondisclosure; negligent misrepresentation; unjust enrichment; negligence; and gross negligence.   Plaintiffs also assert civil conspiracy and aiding and abetting claims that are derivative of their other tort claims.  The motion to dismiss seeks dismissal of all the claims.

---

[3] The Motion to Dismiss refers to an intentional inflection of emotional distress claim, *see* Docket Entry No. 26 at 6, but the First Amended Complaint does not assert one.  *See* Docket Entry No. 23 at 23–42 (alleging causes of action "A" through "N").

## II.   STANDARD OF REVIEW

The Federal Rules require that a claim for relief contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To survive a motion to dismiss, a claim for relief must be "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  The "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly,* 550 U.S. at 556).  A "formulaic recitation of the elements of a cause of action" or "naked assertions devoid of further factual enhancement" will not suffice.  *Id.* (quoting *Twombly*, 550 U.S. at 555, 557 (internal quotation marks omitted)).

Additionally, the Federal Rules impose a heightened pleading standard for fraud allegations, requiring a plaintiff to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  To meet this standard, the plaintiff must "at a minimum . . . set forth the who, what, when, where, and how of the alleged fraud."  *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 266 (5th Cir. 2010) (citations and internal punctuation omitted).  But Rule 9

provides that any state-of-mind requirement for a fraud claim "may be alleged generally."  Fed. R. Civ. P. 9(b); *see also City of Clinton v. Pilgrim's Pride Corp.*, 632 F.3d 148, 154 (5th Cir. 2010).

## III.  ANALYSIS

The multitude of claims Plaintiffs assert in this case is matched in number and creativity by the arguments the Defendant raise in their motion to dismiss.  In an attempt to bring some order to this morass, the Court will first address the defenses that apply to two or more—and in some cases all—of the fourteen claims: plausibility, preemption, and the economic loss rule.  After addressing—and rejecting—those defenses, the Court will proceed to address Wells Fargo's claim-specific legal sufficiency challenges that it accepts.

### A. Plausibility

Wells Fargo argues that two linchpins of Plaintiff's case—the allegations that (1) Wells Fargo was able to manipulate the price of foreclosure sales through the appraisals it obtained, and (2) that it did so because it had a desire to claim loan losses the IRS rule allowed it to deduct—defy economic theory and thus fail to meet the plausibility requirement of *Twombly* and *Iqbal*.  The Court has more doubts about the second allegation than the first, but concludes that even those doubts do not render the allegations implausible.

### 1. Market Manipulation Allegations

According to Wells Fargo, "common sense dictates that a property's value is reflected by its sales price at a public sale," which a foreclosure sale is. Docket Entry No. 26 at 16 (citing Tex. Prop. Code § 51.002(a)). The "market manipulation" allegations therefore are not plausible in its view, because Plaintiffs or others could have purchased the properties at the foreclosure sales if the sales prices were substantially below market value as alleged. Actually, both courts and economists have recognized that the unique features of foreclosure sales may result in them producing sales at below market prices. Texas has long recognized a common law cause of action for wrongful foreclosure, which typically requires proof of a grossly inadequate sales price. *See Charter Nat'l Bank—Houston v. Stevens*, 781 S.W.2d 368, 371 (Tex. App.—Houston [14th Dist.] 1989, writ denied) (tracing the "threads of Texas law on wrongful foreclosure back through more than one hundred years" and concluding that a plaintiff must usually either prove a grossly inadequate sales proof or that the lender engaged in acts designed to "chill" the bidding). A Supreme Court of Texas decision from the late nineteenth century involving a sale of 200 acres of land in Falls County for $61 when testimony indicated the fair market value was between $400 and $2,000 recognized that foreclosure sales may result in below market prices. *Allen v. Pierson*, 60 Tex. 604, 606–07 (1884) (reversing a judgment on the ground that

inadequacy of price alone is not sufficient to annul a foreclosure sale), *cited in*

*Charter Nat'l Bank*, 781 S.W.2d at 373 (noting that the foreclosure sales price in

*Allen* "equated to a fraction of 1/6th to 1/33rd of the fair market value of the

land"). Even earlier Texas cases recognized the phenomena of below-market

foreclosure sales, including one involving a "[l]ot at the foot of Main Street,

Houston, sold for $30 by sheriff whereas fair market value was $600." *Charter*

*Nat'l Bank*, 781 S.W.2d at 373 n.1 (citing *Allen v. Stephanes*, 18 Tex. 658 (1857),

and other cases).

A recent economic study demonstrates that the sales discussed in these

Texas cases are not mere relics of a less sophisticated age. A 2009 Working Paper

from the National Bureau of Economic Research studying foreclosures (and sales

resulting from the death or bankruptcy of an owner) explains that:

> Foreclosed houses are likely to sell at low prices, both because they
> may have been physically damaged during the foreclosure process,
> and because financial institutions have an incentive to sell them
> quickly. In a liquid market, an asset can be sold rapidly with a
> minimal impact on its price, but the characteristics of housing
> discussed above make the market for residential real estate a classic
> example of an illiquid market, in which urgent sales lower prices.

John Y. Campbell et al., *Forced Sales and House Prices* 1 (Nat'l Bureau of Econ.

Research, Working Paper No. 14866, 2009); *see also id.* at 3 ("We find large

foreclosure discounts, about 28% on average."); *id.* at 4 (citing other studies that

demonstrate the illiquidity of the housing market). Given that both the common

law and modern economic analysis recognize the possibility of below-market foreclosure sales, Plaintiffs' allegations on this issue are certainly plausible.

### 2. *Tax Incentive Allegation*

Wells Fargo's other attack on plausibility goes not to the existence of below-market foreclosure sales, but to the allegation that it had an incentive to sell at those prices. As discussed above, Plaintiffs contend that Wells Fargo's willingness to sell the real estate at below market prices stemmed from the special IRS rule that expanded the deductibility of losses from the bad Wachovia loans it acquired.

This argument gives the Court more pause. Even when a tax deduction cushions the blow of a loss, a rational actor would still prefer a gain. Assuming a 25% marginal tax bracket, a tax deduction means the taxpayer is losing only 75 cents instead of a full dollar. But who wouldn't prefer never losing the dollar in the first place?

Plaintiffs try to answer this question this by providing the following hypothetical:

> [A]ssume Wells Fargo spent $20,000 to buy a $200,000 note from Wachovia, secured by a Sanctuary lot. Assume the note went into default and Wells Fargo arranged to have Appraiser C appraise the lot utilizing only foreclosure sales. Assume that Appraiser C valued the lot at $40,000, and that at foreclosure, Wells Fargo bid $40,000. In such an instance, Wells Fargo would be entitled to immediately charge $160,000 as a loss against earnings because of the unique and unprecedented tax benefits it received when it purchased Wachovia. . . . If Wells Fargo were to then sell the lot for $60,000, it would end up with [$20,000] in cash

and a $160,000 write-off against earnings; all the product of a $20,000 investment.[4]

Document Entry No. 23 ¶ 45. But the net in that scenario is a $140,000 loss ($160,000-$20,000) against the original note amount, the same net loss that would result if the lot were sold at foreclosure for the $60,000 market price ($200,000-$60,000). Although the particular tax treatment of these transactions has not been explained in detail at this early stage of the case, from an economic standpoint the substance is the same.

The question becomes whether these doubts the Court has about this loss-maximizing allegation mean the Plainitffs' allegations are not plausible. In making that assessment, it is worth noting that post-*Twombly* and *Iqbal* dismissals on plausibility grounds have not been common. While there is disagreement concerning the extent to which those decisions have increased Rule 12 dismissals as a general matter, *see generally* Lonny Hoffman, *Twombly and Iqbal's Measure: An Assessment of the Federal Judicial Center's Study of Motions to Dismiss*, 6 Fed. Cts. L. Rev. 1 (2011) (critiquing the Federal Judicial Center's study which found that "*Twombly* and *Iqbal* were not having much effect on dismissal practices or outcomes"); Patricia Hatamyar Moore, *An Updated Quantitative Study of*

---

[4] The low price at which it acquired Wachovia may well mean that Wells Fargo was able to achieve tax deductions that exceeded the cost to it of certain loans (assuming the total purchase price can be apportioned to particular loans), but that still does not explain why Wells Fargo was better off taking deductible losses at artificially low prices rather than reducing those losses with a market sales price.

*Iqbal's Impact on 12(B)(6) Motions*, 46 U. Rich. L. Rev. 603 (2012) (finding higher rates of dismissal post-*Iqbal* than the Federal Judicial Center study), it seems clear that most of the dismissals citing *Twombly* and *Iqbal* do so on specificity rather than plausibility grounds*, see* Raymond H. Brescia*, The* Iqbal *Effect*: *The Impact of New Pleading Standards in Employment and Housing Discrimination Litigation*, 100 Ky. L.J. 235, 240 (2012) ("Despite the increased dismissal rate following *Iqbal*, oddly, in a class of cases analyzed for this study, courts rarely invoked the plausibility standard in the same manner it was utilized by the Supreme Court in *Twombly* and *Iqbal*.").

An example of a decision finding an allegation "simply implausible" involved a class action by former KPMG clients claiming that they unknowingly received "improperly licensed" accounting services because a KPMG partner practicing from 1984 through 1999 had not been licensed in Texas.  *See Little v. KPMG LLP*, 575 F.3d 533, 542 (5th Cir. 2009).  The Fifth Circuit concluded that "because the potential basis for revoking KPMG's license and registration came to light too late for the State Board to do anything about it, any other claimed difference in market value between KPMG's 'properly-licensed' and 'improperly-licensed' services—even if theoretically conceivable—is simply implausible."  *Id.* at 541–42.  In *Little*, it thus was not the Fifth Circuit's doubts about a "theoretically conceivable" difference in price between properly and improperly licensed

accounting services that led to the dismissal, but the legal impossibility that the State Board could retroactively revoke KPMG's licenses given the passage of time. *See id*. A Fifth Circuit opinion issued just last week further demonstrates that a claim may be plausible even if it is improbable. The court of appeals characterized *Twombly* and *Iqbal* as permitting a "well-pleaded complaint [to] proceed even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and that a recovery is very remote and unlikely." *Leal v. McHugh*, --- F.3d ---, No. 12-40069, 2013 WL 5379419, at *6 (5th Cir. Sept. 26, 2013) (quoting *Twombly*, 550 U.S. at 556).

That case law—from *Twombly* and *Iqbal* themselves as well as circuit precedent applying them—directing that a claim may be plausible even if it is unlikely to be proved convinces the Court that Plaintiffs' allegations are sufficient when two other considerations are taken into account. First, the allegations concerning manipulation of the appraisals are quite specific, apparently based on whistleblower-type statements from at least one appraiser. Taking these allegations as true, one wonders why Wells Fargo would refuse to use appraisals that included nonforeclosure sales as comparables. Plaintiff's allegations provide an answer. Because *Iqbal* was motivated by concerns about both specificity and plausibility, the high degree of specificity concerning the allegations in this case supports the plausibility of the alleged scheme. *See Iqbal*, 556 U.S. at 678 ("To

survive a motion to dismiss, a complaint must contain *sufficient factual matter*, accepted as true, to 'state a claim that is plausible on its face.'"  (italics added) (quoting *Twombly*, 550 U.S. at 556)).

Second, the allegations relate back to the financial crisis of 2008—a time when the unprecedented became routine in the financial sector.  To cite just a few events, Bank of America purchased Merrill Lynch for what was described as an "absurd price" without conducting due diligence, Andrew Ross Sorkin, *Too Big to Fail: The Inside Story of How Wall Street and Washington Fought to Save the Financial System—and Themselves* 363 (2010); a large money market fund, Reserve Primary, had its assets valued at less than a dollar per share (97 cents), something previously thought impossible, *id*. at 413; and the government instructed Lehman Brothers to file for bankruptcy, *id*. at 360.  Of course, the collapse itself was largely unforeseen, including by Wachovia's CEO who in 2007 stated that he did not expect large mergers "for a while."  *Wachovia CEO sees no big bank mergers for a while*, Reuters  (May  31,  2007) http://www.reuters.com/article/2007/05/31/us-wachovia-mergers-idUSN3119228820070531.  As JP Morgan CEO Jamie Dimon stated during the height of the crisis, "You are about to experience the most unbelievable week in America ever."  Sorkin, *supra*, at 2.  Although the refinancing and foreclosure decisions relating to the Sanctuary loans were not made during this frenzied period,

in assessing the plausibility that the Wells Fargo–Wachovia merger and the special IRS rule that motivated it may have altered ordinary economic incentives, the unprecedented nature of the financial crisis further leads the Court to find the allegations plausible.

### B.    Preemption

Given the conclusion that the allegations are plausible, the Court turns next to Wells Fargo's argument that a number of the state claims are nonetheless preempted by two federal laws—the National Bank Act and the Fair Credit Reporting Act.

### 1.    National Bank Act

"Federally chartered banks"—like Wells Fargo—"are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the [National Bank Act]."  *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2007) (citations omitted).  But "the State's regulations must give way" when they conflict with federal law.  *Id.* at 12 (citation omitted).  The Act reserves for national banks "all such incidental powers as shall be necessary to carry on the business of banking."  12 U.S.C. § 24 (2013).  The Office of the Comptroller of the Currency (OCC) is authorized to define national banks' incidental powers by promulgating rules and regulations that possess the

same preemptive effect as the Act itself.  *Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 554–55 (9th Cir. 2010).

Defendants argue that the National Bank Act preempts Plaintiffs' state-law claims of fraud by nondisclosure and wrongful foreclosure because the claims attempt to "regulate Wells Fargo's banking practices" and impose a duty beyond that required under federal law.  Docket Entry No. 26 at 40–41.  More specifically, Defendants contend that a presumed state-law duty to disclose improper appraisal practices and a wrongful foreclosure claim based on a bank's valuation and bidding practices conflict with the National Bank Act.  But unlike cases in which Courts have given the National Bank Act preemptive force, *see Martinez*, 598 F.2d at 556 (finding that OCC regulation allowing banks to determine amount of underwriting and tax service fees preempted claim under California tort law based on allegation that these fees were too high); *Wells Fargo Bank of Texas NA v. James*, 321 F.3d 488 (5th Cir. 2003) (holding that an OCC interpretative regulation allowing banks to charge fees to anyone who presents a check for payment preempted Texas "par value" statute that prohibited banks from charging check-cashing fees for checks drawn against an account at the same bank), Defendants cite no specific sections of the Act or OCC regulations for its preemption defense.  Other district courts have found that similar state-law tort claims based on misrepresentations are not preempted under the Act.  *See Martinez*, 598 F.3d at

555–56 (citing *Mann v. TD Bank, N.A.*, No. 09-1062, 2009 WL 3818128 (D.N.J. Nov. 12, 2009); *White v. Wachovia Bank*, *N.A.*, 563 F. Supp. 2d 1358 (N.D. Ga. 2008)).

Moreover, Plaintiff's claims relating to unlawful appraisals are rooted in duties arising under federal law,[5] so state tort law liability based on violations of those federal statutes would not conflict with federal banking policy or otherwise "significantly impair the exercise of authority, enumerated or incidental under the [National Bank Act]." *Watters*, 550 U.S. at 12; *cf. Hughes v. Boston Scientific Corp.*, 631 F.3d 762, 769 (5th Cir. 2011) (finding that the FDA did not preempt a state law claim against a medical device manufacturer that was based on an "assertion that the defendant violated a relevant federal statute or regulation"). The National Bank Act does not preempt Plaintiffs' claims.

## 2.   *Fair Credit Reporting Act*

The Fair Credit Reporting Act (FCRA) contains a stronger preemption clause than the National Banking Act. 15 U.S.C. § 1681 et seq (2013). It provides that "[n]o requirement or prohibition may be imposed under the laws of any State . . . with respect to any subject matter regulated under . . .section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to

---

[5] Plaintiffs assert underlying violations of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, which mandates that Defendants must comply with the Uniform Standards of Professional Appraisal Practice in appraising property.

consumer reporting agencies." *Id*. 1681t(b)(1)(F).   Section 1681s-2 prohibits reporting "any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate."   *Id.*  § 1681s-2(a)(1)(A).   Thus, a state-law claim based on a defendant's conduct in furnishing inaccurate information to a consumer reporting agency is preempted by the FCRA.  *See, e.g.*, *Ayers v. Aurora Loan Servs., LLC*, 787 F. Supp. 2d, 451, 457 (E.D. Tex. 2011).

But Plaintiffs' complaint does not appear to base any liability allegations on Defendants' furnishing inaccurate information to a credit reporting agency.   They do, however, seek damages for the bad credit that resulted from their defaults. Texas law recognizes damages for "loss of credit," which are "recoverable as actual damages in a suit where damage to credit was the necessary and usual result of the defendant's actions."   *EMC Mortg. Corp. v. Jones*, 252 S.W.3d 857, 872 (Tex. App.—Dallas 2008, no pet.) (citing *Mead v. Johnson Grp., Inc.*, 615 S.W.2d 685, 688 (Tex. 1981)).  Policing the line between "loss of credit" damages arising from fraudulent conduct and preempted damages relating to credit agency reporting is difficult at the pleading stage, and may be an unnecessary task if plaintiffs are unable to prove liability.  The Court therefore rejects this preemption defense as a ground for Rule 12 dismissal because—even if successful—it would not warrant dismissal of the claim but only limit damages.

### C.    Economic Loss Rule

Defendants also invoke the "economic loss rule" as a basis for dismissal of the tort claims.  The economic loss rule attempts to delineate the long-confounding boundary between tort and contract law.  It bars a tort recovery—and limits a plaintiff to remedies grounded in contract—in certain cases when the plaintiff's injury is purely economic in nature and not accompanied by any physical injury or property damage.  The Texas Supreme Court recently examined the scope of the economic loss rule.  *See Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407 (Tex. 2011).  In *Sharyland*, the court of appeals had denied recovery on the plaintiffs' negligence claim, holding that, under the economic loss rule, damages in tort are only recoverable if a plaintiff suffers "actual physical injury or property damage."  *Id.* at 411, 418 (citation and internal quotation marks omitted).  But the Texas Supreme Court rejected such broad application of the rule, noting that this formulation "overlooks all of the tort claims for which courts have allowed recovery of economic damages even absent physical injury or property damage," including fraud and negligent misrepresentation claims.  *Id.* at 418–19 (citations omitted).  *Sharyland* emphasized that instead the core inquiry in determining the applicability of the economic loss rule is whether the claimed damages arose from "breach of a duty created under contract, as opposed to a duty imposed by law."  *Id*.  at 417.

Plaintiffs' common law claims are based on duties imposed by law, such as the duties not to make misrepresentations and engage in wrongful foreclosure. *See, e.g.*, *Barcenas v. Fed. Home Loan Mortg. Corp.*, No. H-12-2466, 2013 WL 286250, at * 7 (S.D. Tex. Jan. 24, 2013) ("[A]s a matter of law, the economic loss rule does not apply to fraud claims because the parties to a contract have an independent duty not to commit the intentional tort of fraud.").   Indeed, an argument Defendants repeatedly make elsewhere in their motion to dismiss—that Wells Fargo was under no contractual duty to refinance Plaintiffs' loans— demonstrates that the tort claims do not sound in contract and thus are not subject to the economic loss rule.  *See Auriti v. Wells Fargo Bank, N.A.*, No. 3:12-CV-334, 2013 WL 2417832, at *5 (S.D. Tex. June 3, 2013) (noting that allegations of fraud relating to loan modification negotiations were not subject to the economic loss rule because the note and deed of trust did not "impose[] on Defendants a contractual obligation to provide . . . a modification").  The economic loss rule, as clarified in *Sharyland* and numerous district court cases applying it in the context of foreclosure cases, does not bar Plaintiffs' tort claims.

### D.  Challenges to Individual Claims

The Court now turns to Wells Fargo's challenges to the individual causes of action alleged in the complaint.

### 1.  *Statutory Debt Collection Claims*

Plaintiffs have alleged claims under both the federal and Texas debt collection acts.  Because the acts differ in how they define "debt collector," the federal claim fails, but the Texas claim survives.

### i.    Fair Debt Collection Practices Act

The Fair Debt Collection Practices Act prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt" and from using "unfair or unconscionable means to collect or attempt to collect any debt."   15 U.S.C. §§ 1692e, 1692f (2013).   Plaintiffs allege that Defendants violated the FDCPA by using "false and deceptive misrepresentations of their debt"—the allegedly false lot values—in "numerous conversations" with Plaintiffs aimed at collection or refinancing.  Plfs.' Response to Defs.' Motion to Dismiss, Docket Entry No. 28, at 24.  Defendants respond that they are not debt collectors within the meaning of the FDCPA, and that—even if they are—these alleged conversations do not amount to debt collection activity.

"Debt collector" is defined as "any person . . . who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed

or due another." 15 U.S.C. § 1692a(6). The FDCPA exempts from its definition of "debt collector" any individual conducting collection activity if the debt was "not in default at the time it was obtained by such person." *Id.* § 1692a(6)(F)(iii). Plaintiffs argue that—to the extent their loans were in default at the time Wells Fargo merged with Wachovia—Defendants meet the definition of "debt collector."

The Fifth Circuit has rejected this argument in the context of a mortgage company merger. *Brown v. Morris*, 243 F. App'x 31, 34–35 (5th Cir. 2007). In *Brown*, the mortgage company defendant acquired Brown's mortgage "through its merger with Brown's previous mortgage company." *Id.* Brown argued that the mortgage company defendant qualified as an FDCPA debt collector because it had "'obtained' her mortgage while it was in default." *Id.* at 34. Because the FDCPA does not define "obtained," the Fifth Circuit examined legislative history and noted that the FDCPA was intended to cover "all *third persons* who regularly collect debts *for others*" and not "the consumer's creditors, a mortgage servicing company, or an assignee of a debt, as long as the debt was not in default at the time it was assigned." *Id.* (emphasis added) (citations and internal quotation marks omitted). "Along that line, our court has at least implicitly interpreted 'obtained' to be synonymous with 'assigned.'" *Id.* (citing *Perry v. Stewart Title Co.*, 756 F.2d 1197, 1208 (5th Cir. 1985)). The mortgage company defendant thus did not qualify as a debt collector—even if the mortgage was in default when acquired—

because it "was not specifically assigned Brown's mortgage for debt-collection purposes," but rather acquired it through merger.  *Id.* at 34–35.

    *Brown* controls in this case because Wells Fargo obtained the loans as a result of its merger with Wachovia.  Accordingly, Wells Fargo was not acting as a debt collector within the meaning of the FDCPA when it allegedly made false representations about the debt to Plaintiffs.  The FDCPA claim will be dismissed.

### ii.  Texas Debt Collection Act

    The FDCPA provision that led to the *Brown* ruling on collection activity for loans obtained via merger does not exist in the Texas Debt Collection Act's (TDCA) definition of "debt collector."  "The TDCA's definition of debt collector is broader than the FDCPA's definition."  *Miller v. BAC Home Loans Servicing, L.P.*, --- F.3d ----, 2013 WL 4080717, at *3 (5th Cir. Aug. 13, 2013).  The TDCA has a two-tiered structure that includes both "third-party debt collectors" (defined the same as "debt collectors" under the FDCPA) and "debt collectors," which include anyone "who directly or indirectly engages in debt collection."  *Auriti*, 2013 WL 2417832, at *7 (quoting Tex. Fin. Code Ann. § 392.001(6) (West 2013)).  The Fifth Circuit has long recognized this distinction between the federal and Texas acts and held that mortgage servicers and assignees "*are* debt collectors, and therefore *are* covered, under the TDCA."  *Miller*, 2013 WL 4080717, at *4 (citing *Perry v. Stewart Title Co.*, 756 F.2d 1197, 1208 (5th Cir. 1985)) (italics in original);

*see also Gatling v. CitiMortgage, Inc.*, No. H-11-2879, 2012 WL 3756581, at *9 (S.D. Tex. Aug. 28, 2012) (collecting cases comparing the federal and Texas standards). *Brown*'s analysis that a company acquiring a debt through merger does not become a debt collector under the FDCPA because the original holder was not a "debt collector" thus has no application for the TDCA—Wachovia would have been a "debt collector" under the TDCA, so that status transferred to Wells Fargo.

Wells Fargo argues that the TDCA claim fails for an additional reason: the complaint does not specify the alleged misrepresentations. Although there is a split of authority in this district on whether Rule 9(b)'s particularity requirement applies to TDCA claims, *compare Prophet v. Myers*, 645 F. Supp. 2d 614, 618 (S.D. Tex. 2008) (rejecting application of Rule 9(b) and citing 6 cases in support), *with Woodcock v. Chase Home Fin., LLC,* No. H-11-1199, 2012 WL 393260 (S.D. Tex. Feb. 3, 2012) (applying Rule 9(b) to TDCA claim without noting contrary authority), the position rejecting 9(b)'s application to a statutory claim that does not require reliance is better reasoned and more widely accepted. The Court will thus apply the regular Rule 8 notice pleading requirements to the TDCA claim.

The TDCPA prohibits a debt collector from using—in the course of debt collection activity—false, deceptive, or misleading representations that "misrepresent[] the character, extent, or amount of a consumer debt" or "any other false representation or deceptive means to collect a debt." Tex. Fin. Code Ann.

§ 392.304(a)(8), (19) (West 2013).  The section defines "debt collection" as "an action, conduct, or practice in collecting, or in soliciting for collection, consumer debts that are due or alleged to be due a creditor."  *Id.* § 392.001(5).[6]  For a plaintiff to be protected under the TDCPA, the debt being collected must be a "consumer debt," meaning a debt incurred "primarily for personal, family, or household purposes."  *Id.* §§ 392.001(2), (5).

In response to Wells Fargo's argument that the alleged misrepresentations are not sufficiently identified, Plaintiffs point to allegations of direct communications with Wells Fargo representatives regarding their debts—even going so far as to mention one Wells Fargo representative by name—and argue that the misrepresentations in these communications caused their injuries.  *See, e.g.*, Docket Entry No. 23 ¶¶ 50–51 ("Wells Fargo's representative further stated that Wells Fargo did not care whether or not Mr. Miller defaulted, or was foreclosed on, because Wells Fargo was guaranteed to get paid . . . through the federal loan loss guarantee . . . .").  Aside from this and a couple other examples, the claimed communications are not alleged with great specificity.  But given the notice pleading standard that applies to TDCA claims, the Court finds that this claim is sufficiently pleaded.

---

[6] Texas courts have not directly addressed whether foreclosure activity qualifies as "debt collection" under the TDCA, but at least one federal district court sitting in Texas has found that it does.  *See Biggers v. BAC Home Loans Servicing, LP*, 767 F. Supp. 2d 725, 732 (N.D. Tex. 2011) ("Based on the statutory definitions and the status of Texas case law, the court makes an *Erie*-guess that the TDCPA can apply to actions taken in foreclosing on real property.").

2.     *Texas Deceptive Trade Practices Act*

Consumer status is a key element of any Texas Deceptive Trade Practices Act (DTPA) claim.   *See* Tex. Bus. & Com. Code Ann. § 17.50 (West 2013); *Brittan Commc'ns Int'l Corp. v. Sw. Bell Tel. Co.*, 313 F.3d 899, 907 (5th Cir. 2002).   The DTPA defines a consumer as "an individual . . . who seeks or acquires by purchase or lease, any goods or services."   Tex. Bus. & Com. Code Ann. § 17.45(4) (West 2013).   "Goods" include real property.   *Id.* § 17.45(1).   Under Texas law, for Plaintiffs to qualify as consumers (1) they "must have sought or acquired goods or services by purchase or lease," and (2) those "goods or services . . . must form the basis of the complaint."   *Brittan*, 313 F.3d at 907 (citing *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 539 (Tex. 1981)).   Consumer status is a question of law.   *Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d 347, 356 (5th Cir. 1996).

Because money is neither a good nor a service, a pure loan transaction generally "lies outside the DTPA."   *Walker v. FDIC*, 970 F.2d 114, 123 (5th Cir. 1992) (citing *Riverside Nat'l Bank v. Lewis*, 603 S.W.2d 169 (Tex. 1980)).   Nevertheless, if a borrower's objective in obtaining the loan is to acquire goods or services, the lender may be subject to a DTPA claim.   *Gatling*, 2012 WL 3756581, at *13 (citations omitted); *see also La Sara Grain Co. v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558, 567 (Tex. 1984).

Plaintiffs obtained loans from Wachovia with the purpose of purchasing lots in The Sanctuary, at which time they may have qualified as consumers under the DTPA. *See Miller*, 2013 WL 4080717, at *6 ("A loan sometimes may constitute a basis for consumer status under the DTPA." (citations omitted)). But Plaintiffs' present DTPA claim is not premised on any deceptive act related to the past original loan transaction. Plaintiffs complain of "acts occurring years after the financing transaction"—Defendants' subsequent loan servicing and foreclosure activities—that are incidental to the original purchasing objective. *See Gatling*, 2012 WL 3756581, at *13. The transactions that are the focus of Plaintiffs' complaint are not transactions in which Plaintiffs sought to acquire goods; those goods (the real estate) were previously acquired in the original loan transactions. *See Miller*, 2013 WL 4080717, at *6 ("[M]odification is akin to refinancing in that it is not sought for the acquisition of a good or service, but rather to finance an existing loan on previously acquired property." (citations omitted)). Plaintiffs accordingly do not qualify for consumer status and the DTPA claim must fail. *See id.* at *7 (holding that plaintiffs did not qualify as consumers because their complaint was based on "a pure loan transaction"— modification of the original loan, "an entirely separate and distinct transaction, sought after the purchase of the house was complete" (citations omitted)); *Gatling*, 2012 WL 3756581, at *13 (holding that plaintiff was not a DTPA consumer because the claim was not

premised on deceptive acts in the original loan transaction); *see also Reagan v. U.S. Bank Nat'l Ass'n*, No. H-10-2478, 2011 WL 4729845, at *5 (S.D. Tex. Oct. 6, 2011) (holding that plaintiffs' DTPA claim failed because their home served as collateral for the loan in question and was not purchased with those funds).

### 3.    *Usury under the National Bank Act*

The National Bank Act prohibits knowingly "taking, receiving, reserving, or charging" excessive interest.  12 U.S.C. § 86.  The Act authorizes national banks to charge interest on loans at the maximum rate allowed by the law of the state in which the bank is located.  *Id.* § 85.  "Interest" is further defined as "any payment compensating a creditor . . . for an extension of credit" including the "fees connected with credit extension or availability," such as late fees, annual fees, cash advance fees, and membership fees, but not including incidental costs such as appraisal fees, finders' fees, or fees incurred to obtain credit reports.  12 C.F.R. § 7.4001(a) (2001); *see also Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 739 (1996) (finding the term "interest" ambiguous and affording *Chevron* deference to the C.F.R. definition).

The Plaintiffs whose lots were sold at foreclosure sales allege that they were charged usurious interest.  They characterize as "interest" the difference between their deficiencies following the foreclosure sales with the allegedly artificially depressed values and what their deficiencies would have been if the sales had been

conducted at market prices.  Plaintiffs offer no case law—and this Court is not aware of any—to support this novel reading of the National Bank Act.  Defendants counter that this argument is implausible on its face.

The key question is whether the alleged difference in deficiency amounts is a "payment compensating a creditor . . . for an extension of credit."  *Smiley*, 517 U.S. at 741.  This definition contemplates an amount of money *in addition to* the amount of the credit extended.  A deficiency is "[t]he amount still owed when the property secured by a mortgage is sold at a foreclosure sale for less than the outstanding debt."  *Black's Law Dictionary* 455 (8th ed. 2004).  This definition contemplates an amount of money that is *already owed* to the creditor and remains unsatisfied by the sale of the property securing the debt.  It therefore is not a payment for an extension of credit, but the remaining amount of the debt itself.  Plaintiffs have failed to allege sufficient facts to "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555 (citation omitted).

### 4.  *Statutory Fraud*

In Texas, statutory fraud occurs in a real estate transaction when a party makes a "false representation of a past or existing material fact" in order to "induc[e] [a] person to enter into a contract" and the person relies on this false representation "in entering into that contract."  Tex. Bus. & Com. Code Ann. § 27.01(a) (West 2013).  Plaintiffs allege that Defendants artificially depressed

property values in The Sanctuary and that Defendants used these values in negotiating Plaintiffs' loan modification and refinancing options.  Unfortunately for Plaintiffs—even accepting these allegations as true—courts have held that section 27.01 does not apply to loan transactions.  *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 343 (5th Cir. 2008) (citing *Burleson State Bank v. Plunkett*, 27 S.W.3d 605, 611 (Tex. App.—Waco 2000, pet. denied) ("A loan transaction, even if secured by land, is not considered to come under [section 27.01]." (citation omitted))); *see also Horne v. Bank of Am., N.A.*, No. 4:12-CV-622-A, 2013 WL 765312, at *6 (N.D. Tex. Feb. 28, 2013) (dismissing statutory fraud claim when plaintiffs based the claim on "alleged statements made by defendant in the course of a loan or potential modification").  Accordingly, Plaintiffs' statutory fraud claim must be dismissed.

## 5.   *Negligence and Gross Negligence*

Plaintiffs assert common law negligence and gross negligence claims based on their allegations that Defendants failed to abide by the duties imposed upon them by various federal statutes.  Defendants protest this application of negligence law, arguing that it is well settled in Texas that the mortgagor–mortgagee relationship does not give rise to legal duties beyond those imposed in the mortgage contract.  Plaintiffs urge this Court to employ a risk–utility analysis and impose a duty upon Defendants because the risk, foreseeability of harm, and

likelihood of injury outweigh the utility of Defendants' conduct, the burden of guarding against the risk, and the consequences of placing such a burden on Defendants. *See Edward D. Jones & Co. v. Fletcher*, 975 S.W.2d 539, 544 (Tex. 1998) (discussing the risk–utility test).

Federal district courts have generally rejected the existence of extra-contractual duties between a mortgagor and a mortgagee under Texas law. *See Bassie v. Bank of Am., N.A.*, No. 4:12-CV-00891, 2012 WL 6530482, at *5 (S.D. Tex. Dec. 13, 2012) (citing *FDIC v. Coleman*, 795 S.W.2d 706, 708–09 (Tex. 1990)); *see also Escanlar v. Wells Fargo Bank, N.A.*, No. 4:10-CV-498, 2011 WL 1466279, at *5 (E.D. Tex. Mar. 28, 2011) (rejecting argument that various federal laws and the Texas Constitution give rise to a duty between a mortgagor and a mortgagee). The Court agrees that Texas law does not recognize an independent legal duty between a mortgagor and mortgage to support a negligence claim.

This ruling also dooms Plaintiffs' gross negligence claim, which is predicated on a finding of ordinary negligence. *See Dekelaita v. BP Amoco Chem. Co.*, No. G-07-0131, 2008 WL 2964376, at *15 ("A plaintiff who cannot support a cause of action for negligence cannot recover for gross negligence because a finding of ordinary negligence is a prerequisite to a finding of gross negligence." (citations omitted)).

### 6. The Remaining Claims

With respect to Plaintiffs' remaining claims, the Court finds they are sufficiently pleaded under the applicable standard.  Wells Fargo raises issues with some of these claims that also concern the Court, but those challenges are better decided at the summary judgment phase with the benefit of a factual record.

## IV.   CONCLUSION

For the reasons discussed above, Defendants' Motion to Dismiss (Docket Entry No. 26) is **GRANTED IN PART AND DENIED IN PART**.  Except for the Texas Debt Collection Act claim, the statutory claims are dismissed.  The common law claims survive except for the negligence and gross negligence claims.  The following claims thus remain in this case:

Texas Debt Collection Practices Act Claims;

Common Law Unreasonable Debt Collection;

Wrongful Foreclosure;

Fraud by Nondisclosure;

Unjust Enrichment;

Negligent Misrepresentation;

Civil Conspiracy; and

Aiding or Abetting.

SIGNED this 30th day of September, 2013.

_____
Gregg Costa
United States District Judge